UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

BUSREL INC.,                              )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )        Case No. 1:20-cv-1767
                                          )
JULIE DOTTON, KRP HOLDINGS, LLC,          )
and SBM HOLDINGS, LLC,                    )
                                          )
        Defendants.                       )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS**
(Docs. 17 & 19)

Plaintiff Busrel Inc. ("Plaintiff") brings this action against Julie Dotton ("Ms.
Dotton"), KRP Holdings, LLC ("KRP"), and SBM Holdings, LLC ("SBM")
(collectively, "Defendants") alleging that Defendants improperly retained $7,950,000
after Plaintiff and KRP agreed to cancel a contract for the purchase of personal protective
equipment ("PPE"). Plaintiff alleges six causes of action against Defendants: two counts
of breach of contract against KRP and Ms. Dotton (Counts I & II); fraudulent inducement
against KRP and Ms. Dotton (Count III); unjust enrichment against all Defendants
(Count IV); breach of the implied covenant of good faith and fair dealing against KRP
and Ms. Dotton (Count V); and aiding and abetting fraudulent inducement against SBM
(Count VII).[1] Plaintiff seeks compensatory damages as well as consequential damages
including lost profits, punitive damages, prejudgment interest, and attorney's fees and
costs.

SBM's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) was filed on January
6, 2021. (Doc. 17.) Plaintiff opposed that motion on January 20, 2021, and SBM filed a

---

[1] In the Complaint, Counts IV through VII are set forth in a non-sequential order.

reply on January 25, 2021, at which time the court took the pending motion under advisement.

On January 11, 2021, Ms. Dotton and KRP filed a motion to dismiss. (Doc. 19.) Plaintiff filed an opposition on January 25, 2021, and Ms. Dotton and KRP filed a reply on February 1, 2021, at which time the court took their motion to dismiss under advisement.

Plaintiff is represented by Judith A. Archer, Esq., Abigail Fay Schwarz, Esq., and Victoria Vance Corder, Esq. Defendant SBM is represented by David Bolton, Esq., and Defendants Ms. Dotton and KRP are represented by Erin Elizabeth Elmouji, Esq.

## I.    Allegations in the Complaint.

Plaintiff is a Canadian company incorporated under the laws and province of Quebec with its principal place of business at 4753 Boulevard des Grandes-Prairies, Montreal, Quebec H1R 1A5, Canada. KRP is a limited liability company incorporated under the laws of New York with its principal place of business at 2495 Main Street, Suite 470, Buffalo, New York 14214. Ms. Dotton is an individual whose last known address was in Orchard Park, New York and she is the President of KRP. SBM is a limited liability company and, upon information of belief, is incorporated under the laws of Wyoming, operates in New York, and Jonathan Cannon is its Managing Director.

Plaintiff is an official provider of PPE to the Canadian provinces of Quebec and Alberta during the COVID-19 pandemic. In April 2020, Nicolas Giguère, an independent sales agent for Plaintiff, was introduced to Ms. Dotton of KRP by Andrew Moar and Sean Gauthier, for the purposes of procuring PPE for Plaintiff. Mr. Gauthier held himself out to Plaintiff as the head of logistics for KRP.

Mr. Giguère and Mr. Gauthier exchanged text messages, emails, and calls to discuss the PPE, Ms. Dotton's suppliers, and to quote prices. During conversations in early April 2020, Ms. Dotton represented that she could procure large amounts of PPE for Plaintiff "due to her connections." (Doc 1 at 3, ¶ 12.) Specifically, Ms. Dotton represented that she had a unique relationship with a supplier in China that owned over one thousand companies and was state-owned, implying that Plaintiff would have access

to a reliable supply of quality PPE if it purchased PPE through Ms. Dotton or KRP. Plaintiff alleges that:

> Ms. Dotton told to Mr. Giguère, "Our supplier is state owned. So we have no issue getting materials out." She stated that her "China partner owns the factories state owned. He owns over 1000 companies." She also represented to Busrel: "[t]hey will not take any orders from anyone else you will have multiple plants direct for you." Mr. Giguère confirmed, "OK so all the factory control[led] by the Ch[i]nese government and you know them?" and Ms. Dotton responded, "Yes. The owner is supplying me and my group."

*Id.* (first alteration in original).

Ms. Dotton also allegedly represented to Mr. Giguère that her prices were not as low as other suppliers because her supply came from state-owned factories in China but reassured him that her relationships were legitimate. Ms. Dotton also allegedly wrote:

> "We won't be able to do as cheap because government raised raw materials and they are controlling price now. It's not a horrible increase." She further claimed that "the gentlemen we are working with in China worked for President George W[.] [B]ush . . . And wants us to come through for people so he is PUSHING this because of our friendship. That's what you get the price you get. This is why we really can come through at those levels."

*Id.* at 3, ¶ 13.

Ms. Dotton's representations and connections to Chinese factories were allegedly later revealed to be false as was her unique access to a source of supply for PPE and the reasons for her above average quoted prices. Plaintiff alleges this was part of a scheme to induce it to enter a multi-million dollar contract to purchase PPE that Ms. Dotton could not or never intended to deliver the PPE.

On April 14, 2020, in reliance on Ms. Dotton's representations, Plaintiff entered into a contract with Ms. Dotton and KRP to purchase two million NIOSH N95 masks and ten million SMS 3, 3-ply masks in exchange for payment of $8,200,000 USD (the "Bill of Sale"). The Bill of Sale required that all PPE purchased be certified by the Food and Drug Administration and Conformité Européenne and that all Surgical Type 3 masks would have bacterial filtration and particulate filtration equal to or more than 98%/160 MMHG fluid resistance/D.P less or equal 5.0 MMHG/Inflammability Class 1.

On April 15, 2020, in connection with the Bill of Sale, the parties also entered into an escrow agreement (the "Escrow Agreement") whereby Plaintiff would send $8,200,000 to an Escrow Agent who would "disburse the Deposit from the Escrow Account as directed by Seller immediately following Escrow Agent's receipt of the Deposit." (Doc. 1-2 at 3.) Before wiring money to the escrow agent, Mr. Giguère wrote to Ms. Dotton and asked her to confirm the quantity PPE she could deliver by April 17, 2020. She replied "[u]ntil I have money I will not have a schedule." (Doc. 1 at 4, ¶ 18) (internal quotation marks omitted). Mr. Giguère responded in writing "on it with the wire you'll have it I promise[] in a couple of minutes." *Id.* (internal quotation marks omitted). Ms. Dotton replied "[n]o one will move without money[]" and insisted on "100 percent prepayment" for the PPE order. *Id.* (internal quotation marks omitted).

In reliance upon Ms. Dotton's representations and promises, Plaintiff wired $8,200,000 USD to the escrow agent on April 15, 2020. On April 17, 2020, the Escrow Agent released the $8,200,000 USD payment to a Citibank account in Albertson, New York owned by SBM per the instructions of Ms. Dotton. SBM was not a party to the Bill of Sale or the Escrow Agreement. Ms. Dotton did not inform Plaintiff that its money was released to SBM. Plaintiff alleges, upon information and belief, that SBM had actual knowledge of and was substantially assisting Ms. Dotton in perpetrating a fraud on Plaintiff when, among others, it later represented to Plaintiff that it was Ms. Dotton's and KRP's financial advisor.[2]

After Plaintiff wired the payment, Ms. Dotton wrote to Mr. Giguère "[o]kay tell me exactly what you need [t]o shangai fri or sat for emergency." *Id.* at 5, ¶ 22 (internal quotation marks omitted). He responded, "I paid for 2 million NIOSH and 10 million[] 3[-]ply before 17h [April 17] Friday." *Id.* (internal quotation marks omitted). Plaintiff alleges that:

> Instead of providing a delivery schedule for the PPE Busrel had ordered in the Bill of Sale, KRP wrote to Mr. Giguère: "Hello do you want the 20 or

---

[2] SBM's counsel in this lawsuit, David Bolton, is the Escrow Agent identified in the Escrow Agreement. Attorney Bolton is advised to consider whether he is likely to be called as a witness in this proceeding. *See* New York Rule of Professional Conduct 3.7.

4

do you want more. Let me know." Mr. Giguère responded on April 16, 2020: "No we want to have the schedule delivery for what has been paid and for the kn95 [a product for which Busrel was considering purchasing, but for which it had not yet placed an order] we need the full procurement sheet to move forward."

*Id.* at 5, ¶ 23. Ms. Dotton allegedly responded with a delivery schedule for the masks stating:

> "Here is what I can do. I can do 30 million first shipment arrives Tuesday Wednesday then every 2-3 days and you will have full order within 7 days. I'll give it to you no extra money but next order we have to do .31 [31 cents per mask]. Deal?"

(Doc. 1 at 5, ¶ 24.) Mr. Giguère responded, "Deal type 3. Approved. .31 next one?" *id.*, and Ms. Dotton responded, "Yes. 50m," and "Your mask[s] will start coming Wednesday." *Id.*

Mr. Giguère attempted to confirm the origin of the masks asking, do the "3[-]ply come from [C]hina or [M]exico?" *Id.* at 5, ¶ 25 (internal quotation marks omitted). Ms. Dotton responded, "[b]oth[]" but "it will be China first." *Id.* (internal quotation marks omitted).

On April 18, 2020, while awaiting the first delivery of masks, Mr. Giguère asked Ms. Dotton if she could provide "another 50 million" 3-ply masks within seven days in addition to the thirty million she had agreed to deliver. *Id.* at 6, ¶ 26 (internal quotation marks omitted). Ms. Dotton wrote, "I can have 30 million to either site for Canada [i]n 10 days." (Doc. 1 at 6, ¶ 26) (internal quotation marks omitted). This statement contradicted her earlier statement that she could deliver thirty million masks within seven days.

On or before April 18, 2020, Ms. Dotton provided another delivery schedule for the thirty million 3-ply masks, delivering ten million each on April 22, April 27, and April 30. At this point, Mr. Giguère asked Ms. Dotton to confirm that she would be able to procure the thirty million masks that Plaintiff had paid for. Ms. Dotton responded "[y]es but it's going to be more," *id.* at 6, ¶ 29 (internal quotation marks omitted), indicating that the price had increased. She allegedly claimed that she could only provide masks at the previously negotiated price if Plaintiff paid for a three month supply up

front. Mr. Giguère responded, "We agreed for 30 millions [.]28 [cents a mask] and 50 millions .31 [cents a mask]," and told her, "It wasn't in your proposal the 3 months in advance." *Id.* at 6, ¶ 29 (internal quotation marks omitted) (second and third alteration in Complaint).

Plaintiff alleges that Ms. Dotton and Mr. Giguère continued to negotiate a price for a second order of masks prior to delivery of the first order but could not agree to a price or a delivery schedule. Thereafter, "Ms. Dotton's responses became more bewildering and erratic." *Id* at 6, ¶ 30. During the course of negotiations, Ms. Dotton allegedly claimed that she was unable to speak on the phone because she was "on w military officials[,]" *id.* at 7, ¶ 30 (internal quotation marks omitted), and when "Mr. Giguère asked for a video of a factory with his name on it to prove to him that Ms. Dotton had legitimate connections to factories in China, she refused and wrote that people could be 'killed' for doing that and that doing so was 'treason[.]'" *Id.* at 6-7, ¶ 30. On April 21, 2020, after the parties could not agree to a second order, Ms. Dotton wrote, "[w]e can refund your money and part ways . . . I'm working out the refund with them now[]" and "[w]e are refunding you. We can't meet your timeframe." *Id.* at 7, ¶ 31 (internal quotation marks omitted). Plaintiff's President, Louis Morin, spoke with Ms. Dotton and the parties agreed to cancel the Bill of Sale and KRP agreed to refund Plaintiff's money.

Plaintiff did not receive any masks for the $8,200,000 USD it paid. On April 23, 2020, a representative from Plaintiff emailed Ms. Dotton to request a proof of the wire transfer to confirm the $8,200,000 USD refund was in progress. On April 24, 2020, Ms. Dotton responded, "[w]e have requested the refund. I was clear when I told you it would take several days. You will receive it back as soon as possible." *Id.* at 7, ¶ 35 (internal quotation marks omitted). Ms. Dotton did not send proof of the wire transfer. On April 30, 2020, Plaintiff still had not receive the refund and a representative contacted Ms. Dotton again to request proof of the steps she had taken to refund Plaintiff's money. Without providing proof that a refund was in process, she wrote:

As I have stated before we made the request. I was transparent when I told you it was going to take some time. Your order was in the production process. Unfortunately you didn't approve of the dates and timeframes. We are working with the organization to refund your money. We are committed to providing this to you.

(Doc. 1 at 7, ¶ 37.)

On May 26, 2020, when Plaintiff still had not received its refund, Plaintiff's representative wrote to Ms. Dotton: "According to your email of last week, we were to receive the refund by May 23 . . . Can you send me a copy of the wire transfer with the swift number, I will verify with our bank. We need this to be resolved today." *Id.* at 7, ¶ 38 (internal quotation marks omitted). She responded the same day: "I am waiting on the docs from the bank as soon as get them I will send them on to you[,]" *id.* at 8, ¶ 39 (internal quotation marks omitted), she did not, however, send a copy of the wire transfer.

On May 27, 2020, Plaintiff's representative emailed Ms. Dotton, writing "Hi. we did not receive anything ! Is there an issue about the refund of money[]" to which she responded "[n]o issue. I am waiting on the bank. The account is in Australia, it's the time zone difference." *Id.* at 8, ¶ 40. The following day, on May 28, 2020, Plaintiff's representative contacted Ms. Dotton again:

Hi Julie, It was supposed to be May 23, and now you tell me the funds are in Australia! We transfer the funds to your [U.S.] accounts and you said it was transfer[r]ed to China. What Australia has to do with it? Any way a wire don't take 36 hours to be completed, If it was done yesterday in Australia, you should have a copy right now. And the funds should hit our bank account today! Send me proof of transfer.

*Id.* at 8, ¶ 41. Ms. Dotton did not respond or send a copy of the wire transfer. Plaintiff alleges, upon information and belief, that Ms. Dotton's representations that she had initiated a wire transfer to Plaintiff and that she was waiting on documents from a bank in Australia were false and intended to delay Plaintiff from bringing legal action to obtain a refund.

On June 9, 2020, Ms. Dotton emailed Plaintiff's representative allegedly providing "yet another excuse for the delay in the refund," writing "[p]lease see attached letter [from] our financial advisor who is facilitating the extension of our LOC [letter of

credit][.]" *Id.* at 8, ¶ 43 (internal quotation marks omitted) (first and second alterations in Complaint). Mr. Cannon, the author of the attached letter and Ms. Dotton's financial advisor, stated that he was the Managing Director of SBM and that:

> Ms. Dotton informed me of the need to refund your payment to you due to the issues with the manufacturer timeframes and pricing. We started the process several weeks ago to advance the KRP a LOC. The transaction should be completing this week. The deposit will go into our corporate account and the $8.2m will be wired to your account immediately upon receipt.

(Doc. 1 at 9-10, ¶ 45.) At the time, Plaintiff was not aware that SBM had received Plaintiff's funds from the escrow agent. Plaintiff alleges Mr. Cannon, Ms. Dotton, and KRP concealed this information from it and that, upon information and belief, that representations by Ms. Dotton and Mr. Cannon that KRP was obtaining a line of credit to be used to refund Plaintiff and which would be completed that week were false and intended to delay Plaintiff from bringing legal action to obtain a refund of its payment.

On June 16, 2020, Plaintiff's representative received an email from Mr. Cannon stating that a "good faith payment" would be made while SBM and KRP continued to "work with [their] bank and [their] letter of credit advance for the remainder" of Plaintiff's money. *Id.* at 9, ¶ 48 (internal quotation marks omitted). Mr. Cannon added "[i]t is, as it always has been[,] our commitment to return the funds to you." *Id.* (internal quotation marks omitted).

On June 18, 2020, Plaintiff received a payment of $250,000 USD. The payment came from Montrose Capital LLC, which Plaintiff alleges "appears to be a Michigan limited liability company whose registered agent is Sean Gauthier, who works for [Ms.] Dotton and KRP." *Id.* at 9, ¶ 49.

On July 10, 2020, Mr. Cannon told Plaintiff that it would be repaid pursuant to a payment plan as follows: "I have been advised starting the week of July 20th we can pay 500k for two weeks, then we can pay $1,000,000 per week until the rest is paid up." *Id.* at 9, ¶ 50 (internal quotation marks omitted). Plaintiff alleges, upon information and belief, the representations about a payment plan were false and were an effort to delay legal

action. On July 22, 2020, the proposed week for the first payment of $500,000 USD, Plaintiff's representative emailed Mr. Cannon to ask when Plaintiff should expect to receive the wired money. Mr. Cannon responded the following day and stated: "We are providing you with all the documentation on the financial transaction that allows KRP to refund your monies. Due to COVID everything is being delayed." *Id.* at 10, ¶ 52 (internal quotation marks omitted). Mr. Cannon informed Plaintiff's representative that a line of credit would be extended by KRP by an unidentified source on either July 27 or July 28 and that Plaintiff would receive a "letter of intent" following the extension of the line of credit. Plaintiff alleges, upon information and belief, that Mr. Cannon's representations that KRP was receiving a line of credit to repay Plaintiff were false and were intended to delay legal action to obtain a refund of Plaintiff's payment. Plaintiff did not receive payments according to the repayment plan.

On July 31, 2020, Mr. Cannon sent Plaintiff's representative an email discussing a transaction between a French bank and two entities that would aid Mr. Cannon in refunding Plaintiff. Mr. Cannon represented that he had been provided an MT 760, a type of SWIFT message, and was waiting on an MT 799 message from the French bank. Mr. Cannon wrote "[w]e are at the mercy of international compliance." (Doc. 1 at 10, ¶ 56) (internal quotation marks omitted) (alteration in Complaint).

Mr. Morin responded to Mr. Cannon's email noting that he knew that Mr. Cannon's statements were false because an MT 799 precedes an MT 760 and "[t]he MT[ ]799 swift message will have no impact on the financial situation of an individual since it is sent before the funds are frozen. So, what are we waiting for? Should we expect [] payment this week?" *Id.* at 11, ¶ 57 (internal quotation marks omitted) (third alteration in Complaint). Plaintiff alleges, upon information and belief, that Mr. Cannon's statements were false and intended to delay legal action.

On August 14, 2020, Mr. Cannon sent an email to counsel for Plaintiff providing the following update:

> 1. SBLC transaction is moving forward, hopefully funding by end of next week or early the following week[.]

2. Trade transaction- we have confirmed with the sending bank that funds will wired on Aug. 24th without fail, it is already locked in the system to be sent, Bond transaction- we have initiated 50m today and another 200m will be done by Tuesday.

3. Once delivered we can pull funds in 72 hours. I will be able to send confirmation of delivery and then we can send funds once they are released.

[Ms. Dotton] will get this done, Thank you and we appreciate your patience[.]

*Id.* at 11, ¶ 59 (first alteration in Complaint). On August 16, 2020, Ms. Dotton confirmed in an email that Plaintiff would receive between $500,000 and $1,000,000 USD that week. However, no payment was made.

Plaintiff alleges that Defendants continued to perpetrate a scheme to delay legal action while Mr. Cannon misrepresented that a bond transfer was in process. On September 24, 2020, Mr. Cannon sent an email claiming that repayment was delayed because "[t]he Bond transaction we were working on had to be listed on Bloomberg and they needed to file a few other things in order to get it deliverable. We are working on that now." *Id.* at 12, ¶ 63 (internal quotation marks omitted) (alteration in Complaint). In the same email, Mr. Cannon stated that he would send a letter of intent that day and would be able to provide Plaintiff with a new payment schedule. Mr. Cannon did neither.

On October 1, 2020, Mr. Cannon told Plaintiff that a payment schedule was forthcoming and that he had "secured One Billion USD BCL for [Ms. Dotton] to start filling some orders and we have BOTH the Sblc and Bond deliveries taking place in the next day or so." *Id.* at 12, ¶ 66 (internal quotation marks omitted) (alteration in Complaint). Plaintiff alleges, upon information and belief, that Mr. Cannon's statements were false and intended to delay legal action.

On October 29, 2020, Plaintiff sent Ms. Dotton and KRP a demand letter requesting repayment of Plaintiff's money in full within a week. The money was not repaid. On November 6, 2020, Ms. Dotton responded to Plaintiff's counsel with an email stating "[w]e have a transaction closing next week. My attorney will reach out to you and we can establish the repayment structure for your client. Thank you for your patience." *Id.* at 12, ¶ 69 (internal quotation marks omitted). No attorney contacted Plaintiff's

counsel and Plaintiff alleges, upon information and belief, that Ms. Dotton's statements were false and intended to delay legal action.

Plaintiff alleges that "KRP and Ms. Dotton owe [Plaintiff] a refund of $7,950,000 USD, which they have repeatedly admitted." *Id.* at 13, ¶ 71. Plaintiff alleges that, at all relevant times, KRP was the alter ego of Ms. Dotton and that upon information and belief there is a unity of interest and ownership between KRP and Ms. Dotton, "such that any separation between them ceased to exist, and Ms. Dotton completely controlled, dominated, managed, and operated KRP." *Id.* at ¶ 72. Plaintiff further alleges that Mr. Cannon and SBM "held themselves out as the financial advisor for Ms. Dotton and KRP, and upon information and belief, were acting as agents of Ms. Dotton and KRP" *id.* at ¶ 73, and that "SBM was transacting business in New York through its agent Mr. Cannon who was located in New York, and aided and abetted KRP in its fraudulent scheme from New York." *Id.* at ¶ 74.

## II.     Conclusions of Law and Analysis.

Ms. Dotton seeks to dismiss all claims against her on the ground that Plaintiff's allegations seeking to pierce KRP's corporate veil and hold her individually responsible are wholly conclusory. KRP seeks dismissal of all claims other than the breach of contract claim against it in Count I, arguing that a repayment plan was not supported by consideration and cannot be the basis of a breach of contract claim against it, the Complaint fails to state a claim of fraudulent inducement, causes of action for unjust enrichment and breach of the implied covenant of good faith and fair dealing are duplicative or unavailable, and Plaintiff cannot seek consequential damages. Ms. Dotton joins in these additional grounds for dismissal.

SBM seeks dismissal of the aiding and abetting fraudulent inducement and unjust enrichment claims against it, arguing that neither of those claims has been plausibly pled.

### A.     Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679.

The second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**B.      Whether Ms. Dotton is Entitled to Dismissal of All Claims Against Her.**

Ms. Dotton contends that the Complaint's allegations seeking to pierce the corporate veil and hold her personally liable for KRP's alleged malfeasance are wholly conclusory and contain no plausible information that she dominated KRP and disregarded corporate formalities.

As Plaintiff points out, insofar as Count I is concerned, its breach of contract claim against Ms. Dotton set forth therein is proper because she identifies herself and KRP as the "Seller," *see* Doc. 1-1 at 2 ("Julie Dotton KRP Holdings LLC of 7 Pawtucket Row (the 'Seller')"), and signed the Bill of Sale as a single party, *id.* at 4 ("Julie Dotton KRP Holdings LLC (Seller)"). At the pleading stage, this is sufficient to support Plaintiff's claim that, insofar as its breach of contract claim based on the Bill of Sale is concerned, Ms. Dotton and KRP are one and the same and both are the "Seller."

Because Ms. Dotton's liability, if any, for Count I is not based on her alleged domination and control of KRP, it is based upon her individual liability as the "Seller" of the PPE set forth in the Bill of Sale, the motion to dismiss Count I because she cannot be held personally liable for KRP's alleged breach of contract is DENIED.

With regard to Count II of the Complaint, alleging a breach of contract based upon a repayment plan, Plaintiff itself states in its Complaint that "Busrel and KRP Agree[d] to a Repayment Plan." (Doc. 1 at 9.) There is no corresponding allegation in the Complaint that Ms. Dotton personally agreed to the repayment plan or even that she negotiated it on KRP's behalf. Instead, Mr. Cannon from SBM, acting as Ms. Dotton's and KRP's "financial advisor," negotiated the repayment plan which was reflected in a series of communications. As a result, the only way Plaintiff could bring a breach of contract claim against Ms. Dotton for breach of the repayment plan is to pierce KRP's corporate veil.

"New York courts 'disregard corporate form reluctantly,' . . . and "allow[] individuals to incorporate for the very purpose of avoiding personal liability[.]" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 17 (2d Cir. 1996) (citations omitted) (first alteration in original). In order to state a viable cause of action under the doctrine of piercing the corporate veil, the "plaintiff must allege facts that, if proved, indicate that the shareholder exercised complete domination and control over the corporation and 'abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice[.]'" *Grammas v. Lockwood Assocs., LLC*, 944 N.Y.S.2d 623, 625 (N.Y. App. Div. 2012) (alterations omitted) (quoting *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 944 N.E.2d 1135, 1136 (N.Y. 2011)).

To allege domination or control, a party generally must address "whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." *Okapi Partners, LLC v. Holtmeier*, 2019 WL 1517553, at *4 (S.D.N.Y. Apr. 8, 2019) (internal quotation marks omitted) (quoting *D'Mel & Assocs. v. Athco, Inc.*, 963 N.Y.S.2d 65, 65 (N.Y. App. Div. 2013)). Other factors include: "use of 'common office space' with the alleged dominating

13

person, 'the amount of business discretion' the corporation displayed independent of the dominating person, and 'the payment or guarantee of debts of the dominated corporation' by the dominator." *Schulz v. United States*, 831 F. App'x 48, 49 (2d Cir. 2020) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

The court agrees with Ms. Dotton that Plaintiff's corporate veil piercing allegations are conclusory. Plaintiff alleges that "[a]t all relevant times, Defendant KRP was the alter ego of Defendant Dotton[,]" "[u]pon information and belief there exists a unity of interest and ownership between KRP and Ms. Dotton such that any separateness between them has ceased to exist, and Ms. Dotton completely controlled, dominated, managed and operated KRP[,]" and "[u]pon information and belief, Ms. Dotton abused KRP's corporate form, which she used as a conduit to perpetuate a fraudulent business scheme on [Plaintiff] as described herein, while shielding herself from personal liability[.]" (Doc. 1 at 13-15, 17, 19-20, ¶¶ 72, 82, 87, 95, 111.) Although discovery may reveal a basis for Ms. Dotton's individual liability for KRP's alleged breach of the repayment plan, it is not set forth in the Complaint. Ms. Dotton's motion to dismiss Count II against her for failure to state a plausible basis for her individual liability is therefore GRANTED. To the extent Plaintiff's implied covenant claim set forth in Count V against Ms. Dotton is based on the repayment claim, that claim is also DISMISSED.

As for the remaining claims in the Complaint against Ms. Dotton personally, there is no ground for dismissal because "[a] corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced[.]" *N. Shore Architectural Stone, Inc. v. Am. Artisan Constr., Inc.*, 61 N.Y.S.3d 627, 629 (N.Y. App. Div. 2017) (internal quotation marks omitted) (quoting *Rajeev Sindhwani, M.D., PLLC v. Coe Bus. Serv., Inc.*, 861 N.Y.S.2d 705, 709 (N.Y. App. Div. 2008)). In addition, the Complaint clearly alleges that Ms. Dotton personally participated in the alleged wrongful acts and does not rely on her alleged alter ego relationship with KRP for her liability. For this reason, Ms. Dotton's

14

motion to dismiss the remaining claims against her for failure to plausibly allege her personal liability is DENIED.

### C. Whether Plaintiff Adequately Pleads Breach of the Repayment Agreement Against KRP.

KRP seeks dismissal of Count II of the Complaint alleging a breach of the repayment plan, arguing that Plaintiff cannot bring a separate breach of contract claim based upon an agreement to do what KRP was already required to do under the Bill of Sale. As it points out, "consideration is a necessary ingredient for an enforceable contract[,]" *Roth v. Isomed, Inc.*, 746 F. Supp. 316, 319 (S.D.N.Y. 1990), and "'[a] promise to carry out a preexisting contractual obligation,' however, 'generally is not sufficient consideration.'" *Ferguson v. Lion Holding, Inc.*, 312 F. Supp. 2d 484, 494 (S.D.N.Y. 2004) (quoting C.J.S. Contracts § 122).

Although Plaintiff claims that it agreed to delay legal action as valid consideration for the repayment plan, that allegation is not contained in the Complaint. In its Complaint, Plaintiff alleges only that it "delay[ed] . . . bringing legal action to obtain a refund of its payment" as a result of fraud. (Doc. 1 at 8-13, ¶¶ 42, 47, 51, 53, 58, 60, 62, 64, 67, 69, 70.) Moreover, the Complaint is bereft of any allegation that Plaintiff actually assented to the repayment plan, instead of continuing to demand payment in full of its refund immediately. Without consideration for the repayment plan, that agreement is not enforceable and KRP's motion to dismiss Count II is GRANTED.

### D. Whether Plaintiff Adequately Pleads Fraudulent Inducement Against KRP & Ms. Dotton.

The essential elements of a fraudulent inducement claim are: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 285 F. Supp. 3d 579, 586 (W.D.N.Y. 2018) (quoting *Bridgestone/Firestone, Inc.*, 98 F.3d at 19).

"[I]ntentionally-false statements . . . indicating [an] intent to perform under [a] contract[] . . . [are] not sufficient to support a claim of fraud under New York law."

*Bridgestone/Firestone, Inc.*, 98 F.3d at 19. As this court has observed, under New York law,

> [t]o maintain a claim of fraud in such a situation, a plaintiff must either:
> (i) demonstrate a legal duty separate from the duty to perform under the
> contract, . . . ; or (ii) demonstrate a fraudulent misrepresentation collateral
> or extraneous to the contract, . . . ; or (iii) seek special damages that are
> caused by the misrepresentation and unrecoverable as contract damages[.]

*Id.* at 20 (citations omitted).

KRP and Ms. Dotton argue that Plaintiff's fraudulent inducement claim is duplicative of its breach of contract claim based upon the Bill of Sale because "when an alleged representation relates to the terms of a contract, that representation is not collateral or extraneous to the contract and cannot support a fraud claim." *Bloom v. Rock*, 2010 WL 2267468, at *7 (S.D.N.Y. May 27, 2010) (citations omitted). The court agrees. As a result, the alleged fraudulent misrepresentations set forth in paragraph 90 of the Complaint subsections (a) and (d) are not actionable because "[t]he statements that allegedly induced [Plaintiff] to enter into the [Bill of Sale] are wholly related to the [Bill of Sale] and to [Plaintiff's] breach of contract claim" and therefore cannot provide the basis for a fraudulent inducement claim. *E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC*, 2013 WL 6503526, at *6 (S.D.N.Y. Dec. 9, 2013) (noting the "close nexus between the two claims is evidenced at least in part by the fact that [plaintiff] seeks the same set of damages — essentially the benefit of its bargain — for both its breach of contract claim and its fraudulent inducement claim"). Those claims are therefore DISMISSED.

With regard to the remainder of Plaintiff's fraudulent inducement claim, Ms. Dotton and KRP argue that the alleged misrepresentations took place after the Bill of Sale was executed and thus could not induce Plaintiff's reasonable and detrimental reliance. Accepting Plaintiff's allegations as true, the Complaint plausibly alleges that KRP and Ms. Dotton made numerous false statements in order to convince Plaintiff to delay instituting legal action to recover in full the $8,200,000 it paid for PPE pursuant to the Bill of Sale. These allegations do not pertain to promises to perform a contract, they pertain to efforts to conceal KRP's and Ms. Dotton's inability or unwillingness to return

funds to which they acknowledged they were not entitled and which they agreed that they must refund in full.

"[A] promise to take some future action which is collateral to [a] contract can be considered a 'misrepresentation' for purposes of a fraud in the inducement cause of action" if the promise was made with a preconceived, undisclosed intention to not perform. *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). None of Ms. Dotton's or KRP's misrepresentations after the Bill of Sale was executed relate to their ability to provide PPE in certain quantities, at certain prices, and according to a certain schedule. They are, instead, representations of material fact unrelated to PPE and are not duplicative of Plaintiff's breach of contract claim in Count I but constitute a separate scheme to defraud in which Plaintiff contends Mr. Cannon on behalf of SBM played a substantial role. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (holding defendant's "declarations that it 'had recently secured a large environmental law client' and 'was in the process of establishing an environmental law department' were not future promises but representations of present fact[]"); *see also Shugrue v. Stahl*, 985 N.Y.S.2d 547, 548 (N.Y. App. Div. 2014) (finding that the defendants' "misrepresent[ations] to plaintiffs that defendants had obtained all of the required permits and approvals and had completed the construction plans for their home renovation project[] . . . induced plaintiffs to enter into the construction contract with defendants" and were "then present facts"). The alleged misrepresentations set forth in subsection (e) and (f)[3] in paragraph 90 of the Complaint therefore remain actionable.

Ms. Dotton's and KRP's further argument that Plaintiff fails to plausibly allege reasonable reliance and causation is unpersuasive. The Complaint alleges that Ms. Dotton and KRP intended Plaintiff to rely on their and Mr. Cannon's misrepresentations regarding the refund to forestall legal action. Their argument that Plaintiff was insufficiently diligent in failing to discover the true facts is belied by the Complaint's recitation of Plaintiff's efforts to attempt to force Ms. Dotton, KRP, and Mr. Cannon to

---

[3] This appears to be misidentified in the Complaint as a second subsection (e).

provide documentary proof to back-up their oral and written representations. In response, Ms. Dotton, KRP, and Mr. Cannon either ignored Plaintiff's requests, or shifted the alleged source and method of repayment of the refund, or both. Further analysis of the reasonableness of Plaintiff's reliance must await the development of a factual record. *See DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 222 (S.D.N.Y. 2019) ("Because reasonable reliance is a highly fact-specific inquiry, it is often not decided at the motion to dismiss phase of a litigation.") (internal quotation marks omitted). As for causation, Plaintiff alleges that it has received a small fraction of the amount it is owed as part of Defendants' fraudulent scheme. With regard to this aspect of its claim, the pre-Bill of Sale alleged misrepresentations provide factual support for Plaintiff's contention that the PPE transaction was fraudulent from start to finish.

Because Plaintiff has plausibly pled with particularity that, after the Bill of Sale was rescinded, Ms. Dotton and KRP engaged in materially false misrepresentations of existing fact with fraudulent intent to induce Plaintiff to delay legal action to obtain payment in full of a refund Defendants conceded was due and owing, Ms. Dotton's and KRP's motion to dismiss that part of Plaintiff's fraudulent inducement claim is DENIED.

For the foregoing reasons, KRP's and Ms. Dotton's motion to dismiss Plaintiff's fraudulent inducement claim in Count III of the Complaint is GRANTED IN PART and DENIED IN PART.

### E. Whether Plaintiff Plausibly Pleads Aiding and Abetting in Fraudulent Inducement Against SBM.

SBM asserts that Plaintiff fails to state a claim against it for aiding and abetting in fraudulent inducement because the facts alleged in the Complaint occurred after Plaintiff and KRP executed the Bill of Sale, Plaintiff has not alleged that SBM substantially assisted KRP or Ms. Dotton or had actual knowledge of the fraud, and because Plaintiff fails to allege proximate cause.

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's

commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)). "There must also be a nexus between the primary fraud, [the alleged aider and abettor's] knowledge of the fraud[,] and what [the alleged aider and abettor] did with the intention of advancing the fraud's commission[.]" *Id.* (first, second, and third alterations in original) (citation and internal quotation marks omitted). A "[p]laintiff must assert facts showing how a defendant participated as an aider and abettor in the requisite predicate acts." *Charamac Props., Inc. v. Pike*, 1993 WL 427137, at *4 (S.D.N.Y. Oct. 19, 1993). "Substantial assistance occurs when a defendant affirmatively assists, helps, conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner*, 459 F.3d at 295 (internal quotation marks omitted) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)).

"In asserting claims of fraud—including claims for aiding and abetting fraud or a breach of fiduciary duty that involves fraud—a complaint is required to plead the circumstances that allegedly constitute fraud 'with particularity[.]'" *Id.* at 129 (quoting Fed. R. Civ. P. 9(b)).

In its Complaint, Plaintiff alleges the SBM aided and abetted KRP and Ms. Dotton in the following ways: SBM concealed that the $8,200,000 payment had been transferred to it pursuant to the Escrow Agreement and instead represented through Mr. Cannon its status as a financial advisor attempting to help Ms. Dotton and KRP refund Plaintiff's payment. Had Mr. Cannon disclosed that SBM was the recipient of the $8.2 million, Plaintiff could have pursued legal action against it. Instead of disclosing that it had received Plaintiff's funds, Mr. Cannon on behalf of SBM made a series of alleged misrepresentations to Plaintiff about the status of its refund, the reasons for delay, and the method by which it would be paid. In doing so, Mr. Cannon closely aligned himself with Ms. Dotton and KRP and made promises are their behalf. These allegations are sufficient to give rise to a "strong inference" of actual knowledge of the fraud and defeat any suggestion that SBM's role was too attenuated. *In re Refco Secs. Litig.*, 759 F. Supp. 2d at 335 (quoting *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 429 (S.D.N.Y. 2007)).

Because aiding and abetting liability is based on a defendant's "substantial

assistance to advance the fraud's commission[,]" *Krys*, 749 F.3d at 127, and because Plaintiff plausibly alleges with particularity SBM's substantial assistance, all that remains is whether Plaintiff has plausibly alleged causation. With the exception of its lost profits claim, Plaintiff's causation allegations suffice. Plaintiff alleges that SBM's substantial assistance induced Plaintiff to delay legal action which, in turn, delayed and impaired its ability to recover its refund which still has not been paid.

For the reasons state above, SBM's motion to dismiss Plaintiff's aiding and abetting fraudulent inducement claim set forth in Count VII of the Complaint is DENIED.

F.    **Whether Plaintiff Plausibly Pleads a Claim for Unjust Enrichment.**

All Defendants move to dismiss Plaintiff's unjust enrichment claim, asserting it is duplicative of Plaintiff's breach of contract claims, has not been plausibly pled, and is otherwise untenable.

"[I]n order to adequately plead [an unjust enrichment] claim, the plaintiff must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered[.]" *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citation omitted). "The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties[.]" *Id.* (alteration, internal quotation marks, and citation omitted).

Defendants assert that Plaintiff's unjust enrichment claim must be dismissed because the claim is barred by the existence of a written contract on the same subject matter. *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract . . . precludes recovery in quasi contract for events arising out of the same subject matter.") (citation omitted). To the extent Plaintiff's unjust enrichment claim relies on the Bill of Sale, Defendants are correct. Unjust enrichment, however, remains an available equitable remedy because Plaintiff's breach of the repayment plan claim has been

dismissed.

As for Defendants' argument that Plaintiff has not alleged that the retention of its funds is unjust, Plaintiff plausibly alleges that SBM received $8,200,000 USD pursuant to the Escrow Agreement which it wrongfully retained notwithstanding its acknowledgement that a refund to Plaintiff was due. Plaintiff further plausibly alleges that Ms. Dotton and KRP caused that payment to be made and worked in concert with SBM to frustrate Plaintiff's ability to receive a refund they acknowledge was and is due.

Although SBM argues that its relationship with Plaintiff is too attenuated, "privity is not required for an unjust enrichment claim[.]" *See Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1111 (N.Y. 2011). In *Mandarin*, the New York Court of Appeals held that a relationship was too attenuated where there was a complete "lack of allegations that would indicate a relationship between the parties, or at least an awareness by [defendant] of [plaintiff's] existence[.]" *Id.* In contrast, in this case, Plaintiff alleges that it had numerous interactions with Mr. Cannon on behalf of SBM in which Mr. Cannon falsely represented the status of repayment of Plaintiff's payment. In doing so, Mr. Cannon made it clear that he and SBM were acting on Ms. Dotton's and KRP's behalf. Far from being a disinterested third party, SBM and Mr. Cannon are alleged to have played a direct and substantial role in the fraudulent scheme. *See Philips Int'l Invs., LLC v. Pektor*, 117 A.D.3d 1, 8 (N.Y. App. Div. 2014) (denying dismissal of an unjust enrichment claim where the defendant allegedly "knew of the alleged wrong being done to plaintiff and of their essential role in the allegedly wrongful scheme").

SBM argues that, even if Plaintiff plausibly alleges the essential elements of an unjust enrichment claim, Plaintiff's failure to conduct due diligence prevents it from asserting it. *See Dragon Inv. Co. II LLC v. Shanahan*, 49 A.D.3d 403, 405 (N.Y. App. Div. 2008) ("A claim for unjust enrichment does not lie to relieve a party of the consequences of the party's own failure to . . . exercise caution with respect to a business transaction[.]") (citation, internal quotation marks, and alteration omitted). At the pleading stage, Plaintiff is not required to plead that it engaged in due diligence to assert an unjust enrichment claim. Moreover, the Complaint is replete with Plaintiff's efforts to

21

verify the truth of Defendants' statements.

Finally, SBM argues that Plaintiff's unjust enrichment claim must be dismissed because Plaintiff also pleads a "recognized tort." Fed. R. Civ. P. 8(d)(2) allows "[a] party [to] set out [two] or more statements of a claim or defense alternatively or hypothetically[.]" Where "the possibility remains that 'the defendant has not . . . committed a recognized tort,' but that 'circumstances create an equitable obligation running from the defendant[s] to the plaintiff[s,]'" a plaintiff may plead unjust enrichment and a tort claim in the alternative. *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC,* 230 F. Supp. 3d 253, 266 (S.D.N.Y. 2017) (quoting *Corsello v. Verizon N.Y., Inc.,* 967 N.E.2d 1177, 1185 (N.Y. 2012)). "Plaintiff could, for instance, ultimately fail to prove its fraud . . . claims while still establishing that Defendant received a benefit . . . that [ought] to in equity and good conscience be turned over to [Plaintiff]." *Haraden Motorcar Corp. v. Bonarrigo,* 2020 WL 1915125, at *10 (N.D.N.Y. Apr. 20, 2020) (internal quotation marks and citation omitted) (alterations in original).[4]

For the foregoing reasons, KRP's and Ms. Dotton's motion to dismiss Plaintiff's unjust enrichment claim is GRANTED to the extent it relies on the Bill of Sale and DENIED as to the remainder of the claim.

### G. Whether Plaintiff's Implied Covenant of Good Faith and Fair Dealing Claim Duplicates its Breach of Contract Claim.

Ms. Dotton and KRP assert that Plaintiff's breach of the implied covenant of good faith and fair dealing claim is duplicative of Plaintiff's breach of contract claim and must be dismissed on that basis. They argue that Plaintiff merely alleges that they failed to perform under the Bill of Sale and failed to refund money pursuant to a repayment plan, both of which are breach of contract claims.

"Under New York law, a covenant of good faith and fair dealing is implicit in all

---

[4] The court in *Haraden Motorcar Corp. v. Bonarrigo,* 2020 WL 1915125, at *10 (N.D.N.Y. Apr. 20, 2020), observed that "*Corsello* is distinguishable because there, the 'claims for either trespass or inverse condemnation could not fail while still permitting an unjust enrichment claim.'" *Id.* (quoting *Nuss v. Sabad,* 2016 WL 4098606, at *11 (N.D.N.Y. July 28, 2016)). That case is inapposite to the facts presented in the instant case.

contracts during the course of contract performance." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007). The covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" and "[i]n some cases, the covenant may even require affirmative steps to cooperate in achieving the contract's objective." *Id.* "The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that 'would be inconsistent with other terms of the contractual relationship[.]'" *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y. 1995) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). "New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).

None of Plaintiff's allegations set forth in paragraph 117 of the Complaint in support of its implied covenant claim are reflected in Plaintiff's breach of contract claim based upon the Bill of Sale and there is thus no overlap between them. Because the court has dismissed Count II, the breach of the repayment plan claim, Ms. Dotton's and KRP's motion to dismiss Plaintiff's implied covenant of good faith and fair dealing claim is therefore DENIED.

### H.    Whether Lost Profits are Available Against KRP and Ms. Dotton.

Plaintiff seeks consequential damages, including lost profits, for its breach of contract claims, fraudulent inducement claim, and its breach of the implied covenant of good faith and fair dealing claim. In support of this item of damages, it alleges only that it "expected to realize profits on its sale of the PPE purchased from KRP in the Bill of Sale that was never delivered." (Doc. 1 at 14, ¶ 81.) Plaintiff does not further allege it conveyed this expectation to Defendants.

> A court may properly dismiss a claim for consequential damages at the pleading stage where the allegations are insufficient on their face to state a claim, or the documentary evidence demonstrates that the damages were not within the contemplation of the parties at the time of contracting and

therefore are not recoverable as a matter of law.
*ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 2015 WL 247404, at *7 (N.Y. Sup.
Ct. Jan. 14, 2015), *aff'd*, 18 N.Y.S.3d 853 (N.Y. App. Div. 2015); *see also Judd Burstein,
P.C. v. Long*, 797 F. App'x 585, 588 (2d Cir. 2019) (concluding that dismissal of a
counterclaim for consequential damages was proper because the defendant "fail[ed to]
plausibly . . . allege that such consequential damages were 'within the contemplation of
the parties at the time the contract was made'"); *Kantor v. 75 Worth St., LLC*, 945
N.Y.S.2d 245, 245 (N.Y. App. Div. 2012) (upholding dismissal of a plaintiff's claim for
lost profits because "nothing in the record indicates that the parties' agreement
contemplated, in the event of defendants' breach, that defendants would be liable for
plaintiff's failure to realize profits from her new veterinary practice").[5]

Because Plaintiff fails to plausibly allege that any consequential damages,
including its lost profits, were within the contemplation of the contracting parties, it fails
to plead a claim for consequential damages for its breach of contract and implied
covenant of good faith and fair dealing claims.

Plaintiff cannot recover for lost profits for fraudulent inducement because "New
York measures damages in fraud cases based on the out-of-pocket loss suffered by

---

[5] Although Plaintiff cites *Morris v. 702 E. Fifth St. HDFC*, 850 N.Y.S.2d 6 (N.Y. App. Div.
2007) for the proposition that dismissal of its consequential damages claim is unwarranted, the
court in that case merely observed that the "[d]efendant's arguments regarding the parties'
contemplation of lost profits and [the] plaintiff's ability to prove the same are more appropriately
addressed on a motion for summary judgment[.]" *Id.* at 7. New York courts have repeatedly held
that where a plaintiff fails to allege that consequential damages were within the contemplation of
the parties, a claim for consequential damages should be dismissed. *See Perez v. Foremost Ins.
Co.*, 2020 WL 3316095, at *4 (W.D.N.Y. June 18, 2020) ("[U]nless a plaintiff alleges that the
specific injury was of a type contemplated by the parties at the time of contracting, a claim for
consequential damages should be dismissed.") (internal quotation marks omitted); *see also
Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989) ("It is well established that in
actions for breach of contract, the nonbreaching party may recover general damages which are
the natural and probable consequence of the breach. In order to impose on the defaulting party a
further liability than for damages which naturally and directly flow from the breach, i.e., in the
ordinary course of things, arising from a breach of contract, such unusual or extraordinary
damages must have been brought within the contemplation of the parties as the probable result of
a breach at the time of or prior to contracting[.]") (internal quotation marks and alterations
omitted).

plaintiff, but does not include lost profits." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 736 (S.D.N.Y. 1997); *see also In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 121 (S.D.N.Y. 2008), *aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010) (holding that a plaintiff failed to state a claim for fraud because it failed to allege pecuniary loss and "[u]nder the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud") (internal quotation marks omitted) (quoting *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1374 (N.Y. 1996)).

Unjust enrichment is an equitable claim for which lost profits are not available. *See Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2019 WL 5081061, at *2 (D. Vt. Oct. 10, 2019) ("Because a plaintiff is generally not permitted to recover twice for the same injury, [a p]laintiff generally cannot recover both compensatory and restitution damages for the same harm.") (citation and internal quotation marks omitted).

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's request for consequential damages, including lost profits, is GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART and DENIES IN PART SBM's, KRP's, and Ms. Dotton's motions to dismiss. (Docs. 17 & 19.)

SO ORDERED.

Dated this 15th day of July, 2021.

Christina Reiss, District Judge
United States District Court