UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BUSREL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01767 |
| | ) | |
| JULIE DOTTON; KRP HOLDINGS, LLC; | ) | |
| SBM HOLDINGS, LLC; JONATHAN | ) | |
| CANNON; SEAN GAUTHIER; NEW | ) | |
| ENGLAND DEVELOPMENT CORP.; | ) | |
| MONTROSE CAPITAL, LLC. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
AGAINST DEFENDANTS JULIE DOTTON AND KRP HOLDINGS, LLC AND
AWARDING DAMAGES**
(Doc. 88)

Plaintiff Busrel Inc. ("Plaintiff") brings this action against Julie Dotton ("Ms. Dotton"), KRP Holdings, LLC ("KRP"), SBM Holdings, LLC ("SBM"), Jonathan Cannon ("Mr. Cannon"), Sean Gauthier ("Mr. Gauthier"), New England Development Corp. ("NEDC"), and Montrose Capital, LLC ("Montrose Capital") (collectively, "Defendants"), alleging that Defendants improperly retained $7,950,000 of Plaintiff's payment after Plaintiff and KRP agreed to cancel a contract whereby KRP would supply Plaintiff with personal protective equipment ("PPE"). On May 4, 2022, this court entered a default against Defendants Ms. Dotton and KRP pursuant to Federal Rules of Civil Procedure 37 and 55(a). (Doc. 79.)

Pending before the court are Plaintiff's motion for default judgment against Ms. Dotton and KRP pursuant to Federal Rule of Civil Procedure 55(b)(2) and its request for

attorney's fees and costs pursuant to Federal Rule of Civil Procedure 37.[1] (Doc. 88.) On August 2, 2022, the court held an evidentiary hearing on Plaintiff's motion before taking the matter under advisement. Neither Ms. Dotton nor KRP appeared at the hearing.

Plaintiff is represented by Judith A. Archer, Esq., Abigail Fay Schwarz, Esq., and Victoria Vance Corder, Esq. Defendants Ms. Dotton and KRP are self-represented.

## I.    Findings of Fact.

Plaintiff is a Canadian company incorporated under the laws of the province of Quebec with its principal place of business in Montreal, Canada. KRP is a limited liability company incorporated under the laws of New York with its principal place of business in Buffalo, New York. At all relevant times, Ms. Dotton was the President of KRP.

Plaintiff was an official provider of PPE to the Canadian provinces of Quebec and Alberta during the COVID-19 pandemic. In April 2020, Andrew Moar and Mr. Gauthier introduced Nicolas Giguère, an independent sales agent for Plaintiff, to Ms. Dotton of KRP for the purposes of procuring PPE. Mr. Gauthier held himself out to Plaintiff as KRP's head of logistics.

Thereafter, Mr. Giguère and Ms. Dotton exchanged text messages, emails, and calls to discuss the PPE, Ms. Dotton's suppliers, and price quotes. During conversations in early April 2020, Ms. Dotton represented that she could procure large amounts of PPE for Plaintiff "due to her unique connections[.]" (Doc 88-25 at 9.) Specifically, Ms. Dotton represented that she had a special relationship with a supplier in China that owned over one thousand companies and was state-owned, implying that Plaintiff would have access to a reliable supply of quality PPE if it purchased the PPE through Ms. Dotton and KRP. In an email exchange and by telephone with Plaintiff, Ms. Dotton made the following representations: "Our supplier is state owned. So we have no issue getting materials out"; "[our] China partner owns the factories state owned. He owns over 1000 companies"; and "[t]hey will not take any orders from anyone else you will have multiple plants direct for

---

[1] The court will address Plaintiff's request for attorney's fees in a separate order as it is unrelated to Plaintiff's request for a default judgment.

you." (Doc. 87 at 4, ¶ 16). Mr. Giguère confirmed, "OK so all the factory controll[ed] by [the] Ch[i]nese government and you know them?" and Ms. Dotton responded, "Yes . . . The owner is supplying me and my group." (Doc. 88-13 at 3–4.)

Ms. Dotton represented to Mr. Giguère that her prices were not as low as other suppliers because her supply came from state-owned factories in China but reassured him that her relationships were legitimate. She wrote:

> We won't be able to do as cheap because government raised raw materials and they are controlling price now. It's not a horrible increase . . . The gentleman we are working with in China worked for President George W[.] [B]ush. He . . . wants us to come through for people so he is PUSHING this because of our friendship. That's what you get the price you get. This is why we really can come through at those levels.

*Id.* at 4, 8.

Ms. Dotton's representations regarding Chinese factories and her connections to them were false and were part of a scheme to induce Plaintiff to enter into a multi-million-dollar contract to purchase PPE, which Ms. Dotton could not deliver and never intended to deliver.

On April 14, 2020, in reliance on Ms. Dotton's representations, Plaintiff entered into a contract with Ms. Dotton and KRP to purchase two million NIOSH N95 masks and ten million SMS 3, 3-ply masks in exchange for payment of $8,200,000 USD (the "Bill of Sale"). (Doc. 88-14.) The Bill of Sale required that all PPE purchased be certified by the Food and Drug Administration and Conformité Européenne and that all Surgical Type 3 masks have bacterial filtration and particulate filtration equal to or more than 98%/160 MMHG fluid resistance/D.P less or equal 5.0 MMHG/Inflammability Class 1.

On April 15, 2020, in connection with the Bill of Sale, the parties entered into an escrow agreement (the "Escrow Agreement") whereby Plaintiff would send $8,200,000 to an Escrow Agent who would "disburse the Deposit from the Escrow Account as directed by Seller immediately following Escrow Agent's receipt of the Deposit." (Doc. 88-15 at 3.) Before wiring money to the Escrow Agent, Mr. Giguère asked Ms. Dotton to confirm the quantity of PPE she could deliver by April 17, 2020. She replied, "Until I

have money I will not have a schedule." (Doc. 87 at 5, ¶ 22) (internal quotation marks omitted). Mr. Giguère responded in writing, "on it with the wire you'll have it I promise[] in a couple of minutes." *Id.* (internal quotation marks omitted). Ms. Dotton replied, "No one will move without money[]" and insisted on "100 percent prepayment" for Plaintiff's PPE order. *Id.* (internal quotation marks omitted).

　　In reliance upon Ms. Dotton's representations and promises, Plaintiff wired $8,200,000 USD to the Escrow Agent on April 15, 2020. On April 17, 2020, the Escrow Agent released the $8,200,000 USD payment to a Citibank account in Albertson, New York owned by SBM, a limited liability company, pursuant to Ms. Dotton's instructions. SBM is not a party to the Bill of Sale or the Escrow Agreement. Ms. Dotton did not inform Plaintiff that its money was released to SBM, which later represented to Plaintiff that it was Ms. Dotton's and KRP's financial advisor.[2]

　　After Plaintiff wired the $8,200,000 USD payment to the Escrow Agent, Ms. Dotton wrote to Mr. Giguère, "Okay tell me exactly what you need [t]o shangai fri or sat for emergency." *Id.* at 7, ¶ 29 (internal quotation marks omitted). He responded, "I paid for 2 million NIOSH and 10 million[] 3[-]ply before 17h [April 17] Friday." *Id.* (third alteration in original) (internal quotation marks omitted).

　　Instead of providing a delivery schedule for the PPE set forth in the Bill of Sale, KRP wrote to Mr. Giguère: "Hello do you want the 20 or do you want more. Let me know." *Id.* at 7, ¶ 30. Mr. Giguère responded on April 16, 2020: "No we want to have the schedule delivery for what has been paid and for the kn95 [a product for which Busrel was considering purchasing but had not yet placed an order] we need the full procurement sheet to move forward." (Doc. 87 at 7, ¶ 30) (alteration in original) (internal quotation marks omitted). Ms. Dotton responded with a delivery schedule for the masks, stating, "Here is what I can do. I can do 30 million first shipment arrives Tuesday Wednesday then every 2-3 days and you will have full order within 7 days. I'll give it to

---

[2] SBM's counsel in this lawsuit, David Bolton, is the Escrow Agent identified in the Escrow Agreement. Attorney Bolton is advised to consider whether he is likely to be called as a witness in this proceeding. *See* New York Rule of Professional Conduct 3.7.

you no extra money but next order we have to do .31 [meaning 31 cents per mask]. Deal?" *Id.* at 7, ¶ 31 (alteration in original) (internal quotation marks omitted). Mr. Giguère responded, "Deal type 3. Approved. .31 next one?" *id.* at 8, ¶ 31, and Ms. Dotton responded, "Yes. 50m," and "Your mask[s] will start coming Wednesday." *Id.* (internal quotation marks omitted).

Mr. Giguère attempted to confirm the origin of the masks, asking, "[do the] 3[-]ply come from [C]hina or [M]exico?" *Id.* at 8, ¶ 32 (internal quotation marks omitted). Ms. Dotton responded, "Both[,]" but "it will be China first." *Id.* (internal quotation marks omitted).

On April 18, 2020, while awaiting the first delivery of masks, Mr. Giguère asked Ms. Dotton if she could provide "another 50 million" 3-ply masks within seven days in addition to the thirty million she had agreed to deliver. (Doc. 87 at 8, ¶ 33) (internal quotation marks omitted). Ms. Dotton wrote, "I can have 30 million to either site for Canada [i]n 10 days." *Id.* (internal quotation marks omitted). This statement contradicted her earlier statement that she could deliver thirty million masks within seven days.

On or before April 18, 2020, Ms. Dotton provided another delivery schedule for the thirty million 3-ply masks, delivering ten million each on April 22, April 27, and April 30. Mr. Giguère asked Ms. Dotton to confirm that she would be able to procure the thirty million masks for which Plaintiff had previously paid. Ms. Dotton responded, "Yes but it's going to be more," *id.* at 8, ¶ 36 (internal quotation marks omitted), indicating that the price had increased. She claimed that she could only provide masks at the previously negotiated price if Plaintiff paid for a three-month supply up front. Mr. Giguère responded, "We agreed for 30 million[] [.]28 [cents a mask] and 50 million[] .31 [cents a mask]," and told her, "It wasn't in your proposal the 3 months in advance." *Id.* (third and fifth alteration in original) (internal quotation marks omitted).

Ms. Dotton and Mr. Giguère continued to negotiate a price for a second order of masks prior to delivery of the first order but could not agree to a price or a delivery schedule. During the course of her negotiations with Plaintiff, Ms. Dotton claimed that she was unable to speak on the phone because she was "on w[ith] military officials[,]" *id.*

at 9, ¶ 40 (internal quotation marks omitted), and when "Mr. Giguère asked for a video of a factory with his name on it to prove to him that Ms. Dotton had legitimate connections to factories in China, she refused and claimed that people could be 'killed' for doing that and that doing so was 'treason[.]'" *Id.* at 9–10, ¶ 40. On April 21, 2020, after the parties could not agree to a second order, Ms. Dotton wrote, "We can refund your money and part ways. . . . I'm working out the refund with them now[]" and "[w]e are refunding you. We can't meet your timeframe[.]" (Doc. 88-18 at 2–3.) Plaintiff's President, Louis Morin, spoke with Ms. Dotton and the parties agreed to cancel the Bill of Sale and KRP agreed to refund Plaintiff's money.

A day later, on April 22, 2020, Ms. Dotton directed Mr. Cannon to disburse funds in the following manner: $600,000 to "Sean Gauthier" for "consultant per contract"; $50,000 to "VWA Advisors" for "payment per contract"; and $42,924 to "Woods Oviatt" for "payment per contract" and "Legal[.]" (Doc. 88-7.)

Plaintiff did not receive any masks for the $8,200,000 USD it paid. On April 23, 2020, a representative from Plaintiff emailed Ms. Dotton to request proof of the wire transfer to confirm the $8,200,000 USD refund was in progress. On April 24, 2020, Ms. Dotton responded, "We have requested the refund. I was clear when I told you it would take several days. You will receive it back as soon as possible." (Doc. 87 at 11, ¶ 50.) Ms. Dotton did not send proof of the wire transfer. On April 30, 2020, Plaintiff still had not received the refund, so its representative contacted Ms. Dotton again to request proof of the steps she had taken to refund Plaintiff's money. Without providing proof that a refund was in process, she wrote:

> As I have stated before we have made the request. I was transparent when I told you that it was going to take some time. Your order was in the production process. Unfortunately you didn't approve of the dates and timeframes. We are working with the organization to refund your money. We are committed to providing this to you.

(Doc. 88-21 at 2.) On April 29, May 1, May 8, and May 15, 2020, Ms. Dotton directed Mr. Cannon to make additional payments to General Corporate Services, Inc., VWA Advisors, Montrose Capital, and Woods Oviatt. (Doc. 87 at 11–12, ¶¶ 54–56, 58.)

On May 26, 2020, when Plaintiff still had not received its refund, Plaintiff's representative wrote to Ms. Dotton: "According to your email of last week, we were to receive the refund by May 23. . . . Can you sen[d] me a copy of the wire transfer with the swift number, I will verify with our bank. We need this to be resolved today." (Doc. 88-22 at 3.) She responded the same day: "I am waiting on the docs from the bank as as them I will send them on to you." *Id.* at 2. She did not, however, send a copy of the wire transfer. On the same day, Ms. Dotton again emailed Mr. Cannon and directed him to wire $250,000 to "Montrose Capital" for "settlements" and $100,000 to "VWA Advisors" for "payment per contract" and "MS[.]" (Doc. 88-8.)

On May 27, 2020, Plaintiff's representative emailed Ms. Dotton, writing: "Hi, we did not receive anything ! Is there an issue?" to which she responded, "No issue. I am waiting on the bank. The account is in Australia, it's the time zone difference." (Doc. 88-22 at 2.) The following day, on May 28, 2020, Plaintiff's representative contacted Ms. Dotton again:

> Hi Julie, It was supposed to be May 23, and now you tell me the funds are in Australia! We transfer the funds to your [U.S.] accounts and you said it was transfer[r]ed to China. What Australia has to do with it? Any way a wire do[es]n't take 36 hours to be completed, If it was done yesterday in Australia, you should have a copy right now. And the funds should hit our bank account today! Send me proof of transfer[.]

*Id.* Ms. Dotton did not respond or send proof of the wire transfer. Ms. Dotton's representations that she had initiated a wire transfer to Plaintiff and that she was waiting on documents from a bank in Australia were false and were intended to delay Plaintiff from taking prompt action, including legal action, to obtain a refund of its payment.

On June 9, 2020, Ms. Dotton emailed Plaintiff's representative: "Please see attached letter [from] our financial advisor who is facilitating the extension of our LOC [letter of credit]." (Doc. 88-23 at 2.) Mr. Cannon, the author of the attached letter and Ms. Dotton's financial advisor, stated that he was SBM's Managing Director and that:

> Ms. Dotton informed me of the need to refund your payment to you due to the issues with the manufacturer timeframes and pricing. We started the process several weeks ago to advance the KRP a LOC. The transaction

should be completing this week. The deposit will go into our corporate
account and the $8.2m will be wired to your account immediately upon
receipt.

*Id.* at 3. At the time, Plaintiff was not aware that SBM had received Plaintiff's funds from
the Escrow Agent because Ms. Dotton and KRP concealed this information from
Plaintiff. Representations by Ms. Dotton that KRP was obtaining a line of credit to send
the refund to Plaintiff were false and were intended to delay Plaintiff from taking prompt
action to obtain a refund of its payment.

On June 16, 2020, Plaintiff's representative received an email from Mr. Cannon
stating that a "good faith payment" would be made while SBM and KRP continued to
"work with [their] bank and [their] letter of credit advance for the remainder" of
Plaintiff's money. (Doc. 87 at 16, ¶ 78) (alterations in original) (internal quotation marks
omitted). Mr. Cannon added, "It is, as it always has been[,] our commitment to return the
funds to you." *Id.* (internal quotation marks omitted).

On June 18, 2020, Plaintiff received a payment of $250,000 USD. (Docs. 88-12 at
4, ¶ 17; 88-24 at 2.) The payment came from Montrose Capital LLC, a Michigan limited
liability company whose registered agent is Mr. Gauthier.

On July 10, 2020, Mr. Cannon told Plaintiff that it would be repaid pursuant to a
payment plan as follows: "I have been advised starting the week of July 20th we can pay
500k for two weeks, then we can pay $1,000,000 per week until the rest is paid up."
(Doc. 87 at 16, ¶ 81) (internal quotation marks omitted). On July 22, 2020, the proposed
week for the first payment of $500,000 USD, Plaintiff's representative emailed Mr.
Cannon to ask when Plaintiff should expect to receive the wired money. Mr. Cannon
responded the following day and stated: "We are providing you with all the
documentation on the financial transaction that allows KRP to refund your monies. Due
to COVID everything is being delayed." *Id.* at 17, ¶ 83 (internal quotation marks
omitted). Mr. Cannon informed Plaintiff's representative that a line of credit would be
extended by KRP by an unidentified source on either July 27 or July 28 and that Plaintiff
would receive a "letter of intent" following the extension of the line of credit. *Id.* Mr.

Cannon's representations that KRP was receiving a line of credit to repay Plaintiff proved inaccurate as Plaintiff did not receive payments according to the repayment plan.

On July 31, 2020, Mr. Cannon sent Plaintiff's representative an email discussing a transaction between a French bank and two entities that would aid Mr. Cannon in refunding Plaintiff. Mr. Cannon represented that he had been provided an MT 760, a type of SWIFT message, and was waiting on an MT 799 message from the French bank. Mr. Cannon wrote, "[w]e are at the mercy of international compliance." (Doc. 87 at 17, ¶ 86) (alteration in original) (internal quotation marks omitted).

Mr. Morin responded to Mr. Cannon's email noting that he knew that Mr. Cannon's statements were false because an MT 799 precedes an MT 760 and "[t]he MT[ ]799 swift message will have no impact on the financial situation of an individual since it is sent before the funds are frozen. So , what are we waiting for? Should we expect [] payment this week?" *Id.* at 18, ¶ 87 (third alteration in original) (internal quotation marks omitted).

On August 14, 2020, Mr. Cannon sent an email to counsel for Plaintiff providing the following update:

> 1. SBLC transaction is moving forward, hopefully funding by end of next week or early the following week[.]
>
> 2. Trade transaction- we have confirmed with the sending bank that funds will wired on Aug. 24th without fail, it is already locked in the system to be sent, Bond transaction- we have initiated 50m today and another 200m will be done by Tuesday.
>
> 3. Once delivered we can pull funds in 72 hours. I will be able to send confirmation of delivery and then we can send funds once they are released.
>
> Julie [Dotton] will get this done , Thank you and we appreciate your patience[.]

*Id.* at 18, ¶ 90 (second alteration in original). On August 16, 2020, Ms. Dotton confirmed in an email that Plaintiff would receive between $500,000 and $1,000,000 USD that week, however, no payment was made.

On September 24, 2020, Mr. Cannon sent an email claiming that repayment was delayed because "[t]he Bond transaction we were working on had to be listed on

Bloomberg and they needed to file a few other things in order to get it deliverable. We are working on that now." *Id.* at 19, ¶ 94 (internal quotation marks omitted). In the same email, Mr. Cannon stated that he would send a letter of intent that day and would be able to provide Plaintiff with a new payment schedule. Mr. Cannon did neither.

On October 1, 2020, Mr. Cannon told Plaintiff that a payment schedule was forthcoming and that he had "secured a One Billion USD BCL for [Ms. Dotton] to start filling some orders and we have BOTH the Sblc and Bond deliveries taking place in the next day or so." *Id.* at 19, ¶ 96 (internal quotation marks omitted).

On October 29, 2020, Plaintiff sent Ms. Dotton and KRP a demand letter requesting repayment of Plaintiff's money in full within a week. *Id.* at 20, ¶ 100. The money was not repaid. On November 6, 2020, Ms. Dotton responded to Plaintiff's counsel with an email stating, "We have a transaction closing next week. My attorney will reach out to you and we can establish the repayment structure for your client. Thank you for your patience." (Doc. 87 at 20, ¶ 101) (internal quotation marks omitted). No attorney contacted Plaintiff's counsel. Ms. Dotton's statements were false and intended to delay Plaintiff from taking legal action, which could have included emergency motions for an order allowing prejudgment attachment of Ms. Dotton's and KRP's accounts and assets.

Ms. Dotton and KRP owe Plaintiff a refund of at least $7,950,000 USD, by their own admissions.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Under Fed. R. Civ. P. 55, obtaining a default judgment against a party is a two-step process. *See New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005); *see also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) ("Federal Rule of Civil Procedure 55 is the basic procedure to be followed when there is a default in the course of litigation."). "The first step, entry of a default, formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 128 (2d Cir.

2011). "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by Rule 54(c)." *Id.*

Before entering a default judgment, the court is "required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law[.]" *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). Because a defendant who fails to answer or otherwise defend a complaint is "deemed to have admitted all well-pleaded allegations in the complaint pertaining to liability[,]" *id.* at 81 n.1, in conducting its liability analysis, the court is "required to accept all of the [plaintiff's] factual allegations as true and draw all reasonable inferences in its favor[.]" *Id.* at 84 (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

However, "[e]ven when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of the damages are not deemed true." *Credit Lyonnais Sec. USA, Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999). "The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Id.* This inquiry is also two-fold: the court must first "determin[e] the proper rule for calculating damages" on the particular claim. *Id.* The court then "assess[es] [the] plaintiff's evidence supporting the damages to be determined[.]" *Id.* "There must be an evidentiary basis for the damages sought by plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." *Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc.*, 699 F.3d 230, 234 (2d Cir. 2012).

Regardless of the evidence presented, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c); *see also Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) ("By limiting damages to what is specified in the 'demand for judgment,' [Rule 54(c)] ensures that a defendant who is considering default can look at the damages clause, satisfy himself that he is willing to

suffer judgment in that amount, and then default without the need to hire a lawyer.'").

1.    **Choice of Law Analysis.**

Plaintiff asserts that both the United Nations Convention on Contracts for the International Sale of Goods ("CISG") and New York common law govern its breach of contract claim and that New York law governs its remaining claims for fraudulent inducement, unjust enrichment, and breach of the implied covenant of good faith and fair dealing.

The CISG is a "self-executing agreement between the United States and other signatories," including Canada.[3] *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027 (2d Cir. 1995). The CISG "applies to contracts of sale of goods between parties whose places of business are in different States[] . . . when the States are Contracting States[.]" United Nations Convention on Contracts for the International Sale of Goods [CISG], art. 1 § 1(a), *adopted* Apr. 11, 1980, 1489 U.N.T.S. 3. "By agreement, parties may exclude application of the CISG by expressly providing in the contract that the law of a non-CISG jurisdiction applies or that the CISG does not control." *Ajax Tool Works, Inc. v. Can-Eng Mfg. Ltd.*, 2003 WL 223187, at *2 (N.D. Ill. Jan. 30, 2003) (citing CISG art. 6); *see also Transmar Commodity Grp. Ltd. v. Cooperativa Agraria Industrial Naranjillo Ltda.*, 721 F. App'x 88, 89 (2d Cir. 2018) ("'Generally, the CISG governs sales contracts between parties from different signatory countries' unless the parties clearly indicate an intent to be bound by an alternative source of law.") (quoting *Delchi*, 71 F.3d at 1027 n.1).

The Supremacy Clause binds states to the treaties of the United States. U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land[.]"). Thus, under any state's

---

[3] The United States signed the CISG on August 31, 1981 and ratified it on December 11, 1986. Canada acceded to the CISG on April 23, 1991. *See 10. United Nations Convention on Contracts for the International Sale of Goods, in* INTERNATIONAL TRADE AND DEVELOPMENT, https://treaties.un.org/doc/Publication/MTDSG/Volume%20I/Chapter%20X/X-10.en.pdf (last visited Oct. 31, 2022) (listing signatories to the CISG).

law, "the CISG is applicable to contracts where the contracting parties are from different countries that have adopted the CISG." *Asante Techs. v. PMC-Sierra, Inc.*, 164 F. Supp. 2d 1142, 1150 (N.D. Cal. 2001); *see also* 200 A.L.R. Fed. 541 ("Simply stating in the choice of law clause that the law of a particular state will govern the contract is not sufficient, since the CISG, as a federal law of the United States, is also a part of the law in every state.").

In cases where the parties to a contract for the international sale of goods have indicated that the law of a particular state will apply, courts have found that absent "clear language indicating that both contracting parties intended to opt out of the CISG," the parties' chosen state law does not displace the CISG. *Asante*, 164 F. Supp. 2d at 1150 (finding that the CISG is the law of both British Columbia and California and that therefore the parties did not clearly intend to opt out of the CISG); *see also BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 337 (5th Cir. 2003) (finding that the parties' choice of Ecuadorian law did not displace the CISG because the CISG is the law of Ecuador); *St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH*, 2002 WL 465312, at *3 (S.D.N.Y. Mar. 26, 2002) (selecting German law to govern a contract didn't displace the CISG because the CISG is the law of Germany); *Ajax Tool Works, Inc.*, 2003 WL 223187, at *2–3 (holding that the parties' choice of Ontario law did not exclude the CISG because the CISG is the law of Ontario).

In this case, the parties' Bill of Sale was a contract for the sale of goods, specifically, COVID-19 PPE, and their repayment plan contemplated a refund of the sale price. The Bill of Sale was signed by Plaintiff in Canada and by Ms. Dotton and KRP in New York. (Doc. 88-14 at 4.) Both Canada and the United States are signatories to the CISG. Accordingly, the CISG applies to Plaintiff's contract claims. The Bill of Sale designates New York law as controlling: "This Bill of Sale will be construed in accordance with and governed by the laws of the State of New York." *Id.* at 3. The Bill of Sale does not, however, clearly indicate that the parties intended to opt out of the CISG. The CISG therefore controls Plaintiff's contract-based claims for breach of contract and breach of the implied covenant of good faith and fair dealing. Because the court is sitting

in diversity, Plaintiff's remaining claims for fraud and unjust enrichment are governed by New York law. *See Gasperini v. Ctr. for Humans.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").

    **2.    Whether Plaintiff is Entitled to a Default Judgment on Its Breach of Contract Claim.**

        **a.    Whether Ms. Dotton and KRP are Liable for Breach of Contract.**

"A breach of contract claim under the CISG contains the same elements as those under New York State law." *Ningbo Yang Voyage Textiles Co., Ltd. v. Sault Trading*, 2019 WL 5399973, at *3 (E.D.N.Y. Sept. 10, 2019), *report and recommendation adopted*, 2019 WL 5394568 (E.D.N.Y. Oct. 22, 2019) (citing *24/7 Records, Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 42 (2d Cir. 2005) (stating elements under New York law)). Specifically, "[a] plaintiff asserting a breach of contract claim under the CISG must show: (1) the existence of a valid and enforceable contract containing both definite and certain terms, (2) performance by plaintiff, (3) breach by defendant and (4) resultant injury to plaintiff." *Id.* (internal quotation marks omitted).

In this case there is a "valid and enforceable contract containing both definite and certain terms." Pursuant to that contract, on April 14, 2020, Plaintiff contracted with Ms. Dotton and KRP to purchase: (a) 2 million NIOSH N95 masks and (b) 10 million SMS 3, 3-ply masks in exchange for payment of $8,200,000 USD. On April 15, 2020, Plaintiff, Ms. Dotton, and KRP entered into an Escrow Agreement providing for the transfer of $8,200,000 into an Escrow Account "as a deposit towards the purchase of the [PPE]." (Doc. 88-15 at 2.) In Ms. Dotton's contemporaneous communications with Plaintiff's representative, she provided a delivery schedule for the contracted-for PPE, indicating that she acknowledged her and KRP's contractual obligation to provide the PPE at the agreed-upon price. Plaintiff has thus established the first element of its breach of contract claim against Ms. Dotton and KRP under the CISG.

The second element of a breach of contract claim is Plaintiff's performance. On April 15, 2020, Plaintiff wired $8,200,000 to the Escrow Agent, discharging its

obligations under the Bill of Sale. (Docs. 88-12 at 2, ¶ 8; 88-25 at 18.) The Bill of Sale provides that the "Purchaser [Plaintiff] will pay the Purchase Price to the Seller by electronic funds transfer via escrow account or wire transfer" and states that the cost of the property to be provided by the "Seller" is "$8,200,000.00 USD." (Doc. 88-14 at 2.) The Bill of Sale imposes no other obligations on Plaintiff as the "Purchaser." *Id.* Plaintiff cites two forms of bank documentation demonstrating that a wire transfer in the amount of $8,200,000 was sent to the Escrow Agent on April 15, 2020. (Docs. 88-16; 88-17.) Plaintiff therefore performed its contractual obligations under the parties' agreement.

The third element of breach of contract under the CISG is a breach by Defendants Ms. Dotton and KRP. The CISG defines a breach of contract as "fundamental" if "it results in such detriment to the other party as substantially to deprive him of what he is entitled to expect under the contract[.]" CISG art. 25. On April 21, 2020, Ms. Dotton told Plaintiff that she could no longer meet the contract's price and delivery terms and would cancel the contract, writing, "We are refunding you. We can't meet your timeframe." (Doc. 88-18 at 3.) She later confirmed again, "We will refund and part ways." (Doc. 88-19 at 3.) Although Plaintiff agreed to cancel the Bill of Sale and have its money refunded on April 21, 2020, Plaintiff never received a full refund of the $8,200,000. (Docs. 87 at 10, 20 ¶¶ 42, 102; 88-12 at 3, 5, ¶¶ 10–11, 18.) It also never received any masks in exchange for its payment. (Doc. 88-2 at 10, ¶ 43.) Although Plaintiff received a $250,000 partial refund from Ms. Dotton's associate Sean Gauthier through his company, Montrose Capital, LLC (Docs. 88-12 at 4, ¶ 17; 88-24), there is no dispute that a full refund has not been made. Ms. Dotton and KRP owe Plaintiff an outstanding balance of $7,950,000 and their failure to refund the same substantially deprived Plaintiff of the benefit of its bargain under the Bill of Sale and constitutes a material breach.

The fourth and final element of a breach of contract claim under the CISG is "resultant injury to [P]laintiff." Plaintiff was undoubtedly harmed by Ms. Dotton's and KRP's failure to refund the outstanding $7,950,000, as it has paid a substantial amount of money for goods it never received.

As co-signers to the Bill of Sale, both Ms. Dotton and KRP are liable for a breach

thereof. Because the CISG is silent on the availability of joint and several liability, the court applies the parties' chosen law to the issue. Under New York law, "joint and several liability properly is imposed where two parties to a single contract promise the same performance to the same promisee." *NYKCool A.B. v. Pac. Fruit Inc.*, 2011 WL 3666579, at \*3 (S.D.N.Y. Aug. 9, 2011); *see also U.S. Printing & Lithograph Co. v. Powers*, 233 N.Y. 143, 152 (1922) ("It is a general presumption of law that when two or more persons undertake an obligation they undertake jointly, words of severance being necessary to overcome this primary presumption."); *Battery Assocs. v. J & B Battery Supply, Inc.*, 944 F.Supp. 171, 178 (E.D.N.Y. 1996) ("Generally, joint and several liability arises when two or more persons co-sign a contract.") (internal quotation marks omitted). Accordingly, the court finds Ms. Dotton and KRP jointly and severally liable for breach of contract.

> **b.  Whether Plaintiff is Entitled to Compensatory Damages with Interest Against Ms. Dotton and KRP on Its Breach of Contract Claim.**

Under the CISG,

> Damages for breach of contract by one party consist of a sum equal to the loss, including loss of profit, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

CISG art. 74. "This provision is designed to place the aggrieved party in as good a position as if the other party had properly performed the contract." *Delchi Carrier SpA*, 71 F.3d at 1029 (internal quotation marks omitted).

Here, Plaintiff paid $8,200,000 to Ms. Dotton and KRP for PPE that it never received. As Ms. Dotton and KRP were aware that Plaintiff had transferred the entire $8,200,000 purchase price to the Escrow Agent before they breached the contract, at the time of their breach they should have foreseen that Plaintiff would suffer losses up to $8,200,000 if the payment was not refunded in full. Plaintiff is thus entitled to $7,950,000 in compensatory damages, reflecting the partial refund of $250,000 which it received.

Plaintiff seeks pre- and postjudgment interest on any compensatory damages awarded. Article 78 of the CISG provides, "If a party fails to pay the price or any other sum that is in arrears, the other party is entitled to interest on it, without prejudice to any claim for damages recoverable under article 74." Because Article 78 does not specify an interest rate to apply or method for determining that rate, courts have varied widely in their approach to selecting an appropriate interest rate under the CISG. "In the Second Circuit, judges generally have used their discretion to arrive at a reasonable rate, as is commonly done in cases arising under federal question jurisdiction where the relevant statute is silent with respect to prejudgment interest." *Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd.*, 2016 WL 4532911, at *4 (S.D.N.Y. Aug. 23, 2016). At least two courts in the Second Circuit have found it reasonable to look to the postjudgment rate set by 28 U.S.C. § 1961(a) to calculate the prejudgment interest. *See Delchi Carrier, SpA v. Rotorex Corp.*, 1994 WL 495787, at *7 (N.D.N.Y. Sept. 9, 1994) ("Because Article 78 does not specify the rate of interest to be applied, the court in its discretion awards [plaintiff] prejudgment interest at the United States Treasury Bill rate[.]"); *Profi-Parkiet Sp. Zoo v. Seneca Hardwoods LLC*, 2014 WL 2169769, at *10 (E.D.N.Y. May 23, 2014) (awarding prejudgment interest "using the average rate of return on one-year Treasury bills, compounded annually").

An award of prejudgment interest to Plaintiff in accordance with state law is appropriate in this case. *See, e.g., Chicago Prime Packers, Inc. v. Northam Food Trading Co.*, 320 F. Supp. 2d 702, 716 (N.D. Ill. 2004) (applying Illinois law to set prejudgment interest rate in breach of contract case governed by the CISG); *Zhejiang Shaoxing Yongli Printing & Dyeing Co. v. Microflock Textile Grp. Corp.*, 2008 WL 11333554, at *1 (S.D. Fla. July 23, 2008) (following *Chicago Prime Packers* and looking to Florida law); *Shenzen Synergy Digit. Co. v. Mingtel, Inc.*, 2022 WL 2252583, at *3 (E.D. Tex. June 22, 2022) (exercising its discretion to "find[] that the Texas prejudgment interest rate is appropriate"). Plaintiff, Ms. Dotton, and KRP agreed that New York law would control their Bill of Sale. In addition, Plaintiff also asserts non-contract claims against Ms. Dotton and KRP under state law. Applying New York law is therefore consistent with the

parties' intent and expectations.

Under New York law, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991). Sections 5001(b) and 5004 of the New York Civil Practice Law and Rules ("CPLR") govern the calculation of prejudgment interest and set a statutory interest rate of nine percent per annum. Although nine percent per annum is much higher than a federal interest rate based on the United States Treasury Bill rate, it does not "over-compensat[e]" Plaintiff given the "relative equities" of the award. *See Wickham Contracting Co., Inc. v. Loc. Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833–35 (2d Cir. 1992) (allowing "discretionary awards of prejudgment interest" where federal law is silent "when the awards were fair, equitable and necessary to compensate the wronged party fully"). Ms. Dotton and KRP did not "act[] innocently" and had "reason to know of the wrongfulness of [their] actions"; no "good faith dispute [existed] between the parties as to the existence of any liability"; and Plaintiff was not "responsible for the delay in recovery." *Id.* at 834–35. Under New York law, Ms. Dotton and KRP owe prejudgment interest on the amount of $7,950,000 at the rate of nine percent per annum from April 21, 2020 to the date of this Opinion and Order.

As for postjudgment interest, the Second Circuit has "consistently held that an award of postjudgment interest is mandatory" on money judgments in civil cases, pursuant to 28 U.S.C. § 1961(a). *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008); *see, e.g., Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996) ("The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered."). Section 1961(a) provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." Plaintiff is entitled to postjudgment interest calculated in accordance with § 1961(a), to accrue from the date a final judgment is awarded in Plaintiff's favor against Ms. Dotton and KRP.

3.    **Whether Plaintiff is Entitled to a Default Judgment on Its Breach of the Implied Covenant of Good Faith and Fair Dealing Claim.**

Article 7(1) of the CISG provides: "In the interpretation of this Convention, regard is to be had to its international character and to the need to promote uniformity in its application and the observance of good faith in international trade." Federal courts have interpreted Article 7(1) as providing a cause of action for breach of the implied covenant of good faith and fair dealing. *See, e.g., E. Concrete Materials, Inc. v. Jamer Materials Ltd.*, 2019 WL 6734511, at *7 (D.N.J. Oct. 25, 2019) (noting that "plaintiff could properly assert such claim [for breach of the implied covenant of good faith and fair dealing] under either Article 7(1) of the CISG or New Jersey law"); *Shagrow Telecom Tech Co. Ltd. v. Gentec Enters., Inc.*, 2014 WL 12688419, at *3 (C.D. Cal. Feb. 28, 2014) (finding that the "language [of Article 7(1)] indicates that the CISG intended for an implied covenant of good faith and fair dealing to exist in contracts over which it governs").

"Questions concerning matters governed by [the CISG] which are not expressly settled in it are to be settled in conformity with the general principles on which it is based or, in the absence of such principles, in conformity with the law applicable by virtue of the rules of private international law." CISG art. 7(2). Because the CISG provides no other guidance on observing good faith in international trade, it does not "expressly settle" the issue of how an implied covenant of good faith and fair dealing may be breached under the CISG. In the absence of additional guidance from the CISG's "general principles" on this subject, *see, e.g.,* CISG art. 8 (discussing how to interpret the parties' intent); CISG art. 10 (providing that contracts need not be in writing), a federal district court sitting in diversity determines the "law applicable by virtue of the rules of private international law" by reference to the forum state's choice of law rules. *See Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state[.]").

When making a choice-of-law determination in a contract case involving an

express contractual choice-of-law provision, the Second Circuit has found that "New York law is unambiguous . . . . Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." *United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) (internal quotation marks omitted); *see also Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 94 (S.D.N.Y. 2021) (following *Moseley* but noting that the decision of the New York Court of Appeals in *Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466 (2015) directed that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract") (internal quotation marks omitted).

"[M]ost courts [have] deemed one party's incorporation in the state of the parties' chosen law sufficient for purposes of the reasonable relationship test." *Willis Re Inc.*, 550 F. Supp. 3d at 95 (internal quotation marks omitted). Because KRP is a limited liability corporation incorporated in New York and Ms. Dotton is a New York resident, the parties' New York contacts provide a sufficient basis for the contractual selection of New York law. In addition, "considerations of public policy would call for application of substantive New York law[,]" *id.*, as New York courts have long recognized that "in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied will be enforced . . . ." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983). Under New York's choice-of-law rules, New York law provides the relevant "rules of private international law" in this case.

New York courts have explained that the implied covenant of good faith and fair dealing "is in aid and furtherance of other terms of the agreement of the parties." *Id.* It "cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 359 (S.D.N.Y. 2001).

Courts in the Second Circuit have consistently dismissed implied covenant claims brought under New York law and based on the same underlying facts as a breach of contract claim as duplicative. *See, e.g., Rienzi & Sons, Inc. v. N. Puglisi & F. Industria*

*Paste Alimentari S.P.A.*, 2013 WL 2154157, at *8 (E.D.N.Y. May 16, 2013) ("[M]ost courts 'faced with a complaint brought under New York law and alleging both breach of contract and breach of a covenant of good faith and fair dealing [have] dismissed the latter claim as duplicative.") (second alteration in original) (internal quotation marks omitted); *Weihai Textile Grp. Imp. & Exp, Co. v. Level 8 Apparel, LLC*, 2014 WL 1494327, at *15 (S.D.N.Y. Mar. 28, 2014) ("[T]he weight of authority in this district strongly supports the dismissal of an implied covenant claim based on the same underlying facts as a breach of contract claim.") (alteration in original) (internal quotation marks omitted) (citing *Goldblatt v. Englander Commc'ns, L.L.C.*, 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007) (collecting cases)).

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing relies in part on the same underlying facts as its breach of contract claim: that Ms. Dotton and KRP breached the Bill of Sale by canceling the contract and failing to refund Plaintiff's money. To the extent that Plaintiff's breach of the implied covenant of good faith and fair dealing claim is based on the same facts as its breach of contract claim, the claim is duplicative. However, Plaintiff further grounds its breach of the implied covenant of good faith and fair dealing claim on Ms. Dotton's and KRP's agreement to a repayment plan coupled with their repeated misrepresentations regarding that plan. "Absent the existence of a contract, a claim alleging breach of the implied covenant of good faith and fair dealing is legally unavailing." *Keefe v. N.Y. L. Sch.*, 897 N.Y.S.2d 94, 95 (N.Y. App. Div. 2010). After Ms. Dotton and KRP breached the Bill of Sale, they did not enter any subsequent contracts with Plaintiff. This court has previously found that the "repayment plan" was not a contract. *See* Doc. 33 at 15 ("Without consideration for the repayment plan, that agreement is not enforceable[.]"). Because the non-duplicative facts underlying Plaintiff's breach of the implied covenant of good faith and fair dealing claim involve events that occurred in the absence of a contract between KRP, Ms. Dotton, and Plaintiff, the court DISMISSES Plaintiff's claim for breach of the implied covenant of good faith and fair dealing as duplicative and DENIES Plaintiff's Motion for Default Judgment on this claim.

4.  **Whether Plaintiff is Entitled to a Default Judgment on Its Fraudulent Inducement Claim.**

a.  **Whether Ms. Dotton and KRP are Liable for Fraudulent Inducement.**

To state a claim for fraudulent inducement under New York law, a plaintiff must demonstrate: "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011). "In addition, the plaintiff must allege specific facts as to the fraud, including the misleading statements, speaker, time, place, individuals involved, and specific conduct at issue." *Id.* (citing Fed. R. Civ. P. 9(b); *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 51 (2d Cir. 1995)).

Almost immediately after Ms. Dotton cancelled the PPE transaction, she repeatedly made statements indicating that Plaintiff's refund was being processed. For example, on April 24, 2020, Ms. Dotton informed Plaintiff that she had requested the refund, but that it would "take several days" and that Plaintiff would "receive it back as soon as possible." (Doc. 87 at 11, ¶ 50) (internal quotation marks omitted). A week later, in response to further inquiries from Plaintiff, Ms. Dotton stated, "As I have stated before we made the request. I was transparent when I told you it was going to take some time. . . . We are working with the organization to refund your money. We are committed to providing this to you." *Id.* at 11, ¶ 53. Between May and November 2020, Ms. Dotton consistently assured Plaintiff that it would receive a refund soon. Ms. Dotton's representations to Plaintiff about the status of the refund were knowingly and intentionally false and were intended to induce Plaintiff to refrain from taking legal action as it awaited the promised refund. Plaintiff reasonably relied on those promises to its detriment. Had Plaintiff taken prompt legal action against Ms. Dotton and KRP, it may have been able to freeze their accounts and assets or at least file a lien thereon as part of a prejudgment remedy.

Instead, Plaintiff filed suit against Ms. Dotton and KRP on December 2, 2020, after sending them a legal demand letter requiring repayment on October 29, 2020. *Id.* at

20, ¶ 100. Plaintiff acted reasonably in relying on Ms. Dotton's and KRP's repeated representations that payment would be immediately forthcoming and remained in regular contact with Ms. Dotton, KRP, and Mr. Cannon. Plaintiff attempted to require Ms. Dotton, KRP, and Mr. Cannon to provide documentary proof to support their oral and written representations. In response, Ms. Dotton, KRP, and Mr. Cannon either ignored Plaintiff's requests or made further misrepresentations. Plaintiff was unaware of the relationship between Ms. Dotton, Mr. Cannon, and SBM. As a result, the true facts were not known to Plaintiff and could not reasonably have been discovered in light of Ms. Dotton's status as the primary source of information. Plaintiff's reliance on Ms. Dotton's and KRP's misrepresentations resulted in injury consisting of a loss of $7,950,000 it was fraudulently induced to pay. Ms. Dotton and KRP are therefore jointly and severally liable for fraudulent inducement in the amount of $7,950,000.

> **b.    Whether Plaintiff is Entitled to Compensatory Damages with Interest Against Ms. Dotton and KRP on Its Fraudulent Inducement Claim.**

Plaintiff seeks compensatory damages as well as pre- and postjudgment interest. In a fraud action, "[t]he true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the 'out-of-pocket' rule[.]" *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996) (internal quotation marks omitted). "Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained[.]" *Id.*

As this is a diversity action, the question of prejudgment interest for Plaintiff's fraud claim is governed by New York law. *Baker v. Dorfman*, 239 F.3d 415, 426 (2d Cir. 2000). New York law entitles Plaintiff to an award of prejudgment interest at the rate of nine percent per annum. *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 269 (E.D.N.Y. 2012) ("Under New York law, awarding prejudgment interest on damages awarded for fraud is mandatory."); N.Y.C.P.L.R. § 5004 ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute[.]"). This prejudgment interest "shall be computed from the earliest ascertainable date the cause of

action existed[.]" N.Y.C.P.L.R. § 5001(b). Ms. Dotton and KRP first promised Plaintiff that they would refund Plaintiff's payment on April 21, 2020. Plaintiff is therefore entitled to an award of prejudgment interest on the amount of $7,950,000 at the rate of nine percent per annum from April 21, 2020 to the date of this Opinion and Order.

Plaintiff is also entitled to postjudgment interest under 28 U.S.C. § 1961(a). *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *see also Lewis v. Whelan*, 99 F.3d at 545 ("The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered."). The award of postjudgment interest shall be calculated in accordance with § 1961(a). *See* 28 U.S.C. § 1961(a) ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.").

### c.  Whether Plaintiff is Entitled to Punitive Damages Against Ms. Dotton and KRP on Its Fraudulent Inducement Claim.

Finally, Plaintiff seeks punitive damages, although its motion for a default judgment is bereft of any mention of this type of damages or any briefing in support thereof. Plaintiff's counsel orally requested punitive damages at the motion hearing held on August 2, 2022. No dollar amount of punitive damages was requested by counsel nor is one set forth in Plaintiff's Amended Complaint. The court thus DENIES WITHOUT PREJUDICE Plaintiff's request for punitive damages.

### 5.  Whether Plaintiff is Entitled to a Default Judgment on Its Unjust Enrichment Claim.

In the alternative, Plaintiff asks this court to enter a default judgment against Ms. Dotton and KRP for unjust enrichment. Under New York law, "[t]he basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (quoting *Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 421 (1972)). However, "unjust enrichment is not a catchall cause of action to be used when others fail." *Id.* It is "an equitable claim that is unavailable where an adequate

remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010) (citing *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002)).

As Plaintiff's unjust enrichment claim "simply duplicates" its breach of contract claim, *Corsello*, 18 N.Y.3d at 790, Plaintiff has an adequate remedy at law and unjust enrichment is not available in addition to that remedy. The court therefore DENIES Plaintiff's Motion for Default Judgment on its unjust enrichment claim.

## CONCLUSION

For the reasons set forth above, the court hereby GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Default Judgment (Doc. 88) as follows:

1. Breach of Contract claim: GRANTED. Judgment is entered in Plaintiff's favor and against KRP Holdings, LLC and Julie Dotton, jointly and severally, in the amount of $7,950,000 USD in compensatory damages, with prejudgment interest accruing at a rate of nine percent per annum from April 21, 2020 to the date of this Opinion and Order, and postjudgment interest accruing from the date of judgment at the applicable federal rate;

2. Breach of the Implied Covenant of Good Faith and Fair Dealing claim: DENIED;

3. Fraudulent Inducement claim: GRANTED. Judgment is entered in Plaintiff's favor and against KRP Holdings, LLC and Julie Dotton, jointly and severally, in the amount of $7,950,000 USD in compensatory damages, with prejudgment interest accruing at a rate of nine percent per annum from April 21, 2020 to the date of this Opinion and Order, and postjudgment interest accruing from the date of judgment at the applicable federal rate;

4. Unjust Enrichment claim: DENIED.

SO ORDERED.

Dated this 1st day of November, 2022.

Christina Reiss, District Judge
United States District Court