UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BUSREL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-01767 |
| | ) | |
| JULIE DOTTON; KRP HOLDINGS, LLC; | ) | |
| SBM HOLDINGS, LLC; JONATHAN | ) | |
| CANNON; SEAN GAUTHIER; NEW | ) | |
| ENGLAND DEVELOPMENT CORP.; | ) | |
| MONTROSE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS**
(Docs. 96, 100)

Plaintiff Busrel Inc. ("Plaintiff") brings this action against Julie Dotton ("Ms. Dotton"), KRP Holdings, LLC ("KRP"), SBM Holdings, LLC ("SBM"), Jonathan Cannon ("Mr. Cannon"), Sean Gauthier ("Mr. Gauthier"), New England Development Corp. ("NEDC"), and Montrose Capital, LLC ("Montrose Capital") (collectively, "Defendants"), alleging that Defendants improperly retained $7,950,000 of Plaintiff's payment after Plaintiff and KRP agreed to cancel a contract whereby KRP would supply Plaintiff with personal protective equipment ("PPE").

Pending before the court are Mr. Cannon's and NEDC's motions to dismiss Plaintiff's Amended Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 96, 100.) Mr. Cannon filed his motion to dismiss on July 14, 2022 (Doc. 96), and Plaintiff opposed the motion on July 28, 2022. (Doc. 101.) Mr. Cannon replied on August 12, 2022 (Doc. 105), at which time the court took the motion under advisement. NEDC filed its motion to dismiss on July 27, 2022 (Doc. 100), and

Plaintiff opposed the motion on August 10, 2022. (Doc. 104.) NEDC replied on August 14, 2022 (Doc. 106), at which time the court took the motion under advisement.

Plaintiff is represented by Judith A. Archer, Esq., Abigail Fay Schwarz, Esq., and Victoria Vance Corder, Esq. Mr. Cannon is represented by David Bolton, Esq. NEDC is represented by Ira Levine, Esq.

## I.      Allegations in the Amended Complaint.

Plaintiff is a Canadian company incorporated under the laws of the province of Quebec with its principal place of business in Montreal, Canada. SBM is a limited liability company that is incorporated under the laws of Wyoming and has a mailing address in New York. NEDC is a business incorporated under the laws of Vermont with its principal place of business at Mr. Cannon's home address in New York. At all relevant times, Mr. Cannon was the Managing Director and sole owner of SBM and the President, Vice President, Secretary, and sole owner of NEDC.

Plaintiff was an official provider of PPE to the Canadian provinces of Quebec and Alberta during the COVID-19 pandemic. In April 2020, Andrew Moar and Mr. Gauthier introduced Nicolas Giguère, an independent sales agent for Plaintiff, to Ms. Dotton of KRP for the purposes of procuring PPE.

On April 14, 2020, in reliance on Ms. Dotton's representations regarding her ability to procure large quantities of PPE, Plaintiff entered into a contract with Ms. Dotton and KRP to purchase two million NIOSH N95 masks and ten million SMS 3, 3-ply masks in exchange for payment of $8,200,000 USD (the "Bill of Sale"). (Doc. 88-14.) On April 15, 2020, in connection with the Bill of Sale, the parties entered into an escrow agreement (the "Escrow Agreement") whereby Plaintiff would send $8,200,000 to an Escrow Agent who would "disburse the Deposit from the Escrow Account as directed by Seller immediately following Escrow Agent's receipt of the Deposit." (Doc. 88-15 at 3.) Plaintiff alleges Mr. Cannon introduced SBM's counsel David Bolton[1] to Ms.

---

[1] SBM's counsel in this lawsuit, David Bolton, is the Escrow Agent identified in the Escrow Agreement. Attorney Bolton is advised to consider whether he is likely to be called as a witness in this proceeding. *See* New York Rule of Professional Conduct 3.7.

Dotton on March 31, 2020 so that Mr. Bolton could serve as the Escrow Agent for the transaction with Plaintiff, telling Mr. Bolton in an email that Mr. Cannon was "doing business" with Ms. Dotton and would receive part of the money from the deal with Plaintiff. (Doc. 87 at 6, ¶ 26) (internal quotation marks omitted).

Plaintiff wired $8,200,000 to the Escrow Agent on April 15, 2020. On April 17, 2020, the Escrow Agent released the $8,200,000 payment to a Citibank account in Albertson, New York owned by SBM pursuant to Ms. Dotton's instructions. SBM is not a party to the Bill of Sale or the Escrow Agreement. Ms. Dotton did not inform Plaintiff that its money was released to SBM, which later represented to Plaintiff that it was Ms. Dotton's and KRP's financial advisor. A day after Plaintiff transferred the payment to the Escrow Account, Mr. Cannon allegedly emailed a document to Ms. Dotton "for the funds going into my Corp account" and a disbursement sheet for her to use "whenever there are funds" from Plaintiff that she wanted Mr. Cannon to transfer. *Id.* ¶ 27 (internal quotation marks omitted).

After Plaintiff wired the $8,200,000 payment to the Escrow Agent, Ms. Dotton and Mr. Giguère began negotiating regarding the delivery schedule for Plaintiff's first order of PPE and the possibility of an order of masks. Plaintiff alleges that on April 20, 2020, while Ms. Dotton was negotiating with Mr. Giguère, Mr. Cannon made four wire transfers from SBM's account using the $8,200,000 from Plaintiff. Mr. Cannon transferred $281,326.83 to "WHD," the Wage and Hours Division of the Department of Labor, to pay a Department of Labor settlement reached by Ms. Dotton in connection with another lawsuit; $200 to "Genesis" for unknown purposes; $1,000,000 to a "China Supplier"; and $2,750,000 to NEDC. *Id.* at ¶ 38 (internal quotation marks omitted). After the money reached NEDC's account, Mr. Cannon allegedly "used the money as if it were his own" by transferring it to his family members, other NEDC bank accounts, and other companies. *Id.* at ¶ 39.

On April 21, 2020, Ms. Dotton wrote to Mr. Giguère, "We can refund your money and part ways. . . . I'm working out the refund with them now[]" and "[w]e are refunding you. We can't meet your timeframe[.]" (Doc. 88-18 at 2-3.) Plaintiff's President, Louis

Morin, spoke with Ms. Dotton and the parties agreed to cancel the Bill of Sale and KRP agreed to refund Plaintiff's money.

A day later, on April 22, 2020, Ms. Dotton directed Mr. Cannon to disburse funds in the following manner: $600,000 to "Sean Gauthier" for "consultant per contract"; $50,000 to "VWA Advisors" for "payment per contract"; and $42,924 to "Woods Oviatt" for "payment per contract" and "Legal." (Doc. 87 at 10, ¶ 45) (internal quotation marks omitted). Plaintiff alleges that Mr. Cannon made the wire transfers as directed using Plaintiff's money. He also made a transfer to "Optimal Health" in the amount of $88.89. *Id.* ¶ 46 (internal quotation marks omitted). Mr. Cannon allegedly wired $600,000 of Plaintiff's money to Montrose Capital on April 23, 2020. Plaintiff asserts that none of these transfers were for the purpose of procuring PPE.

Plaintiff did not receive any PPE for the $8,200,000 it paid. On April 23, 2020, a representative from Plaintiff emailed Ms. Dotton to request proof of the wire transfer to confirm the $8,200,000 refund was in progress. On April 24, 2020, Ms. Dotton responded, "We have requested the refund. I was clear when I told you it would take several days. You will receive it back as soon as possible." *Id.* at 11, ¶ 50 (internal quotation marks omitted). Ms. Dotton did not send proof of the wire transfer. Plaintiff alleges that on the same day, Mr. Cannon disbursed $42.33 of Plaintiff's money to "Genesis" for purposes other than procuring PPE. *Id.* ¶ 51 (internal quotation marks omitted).

On April 30, 2020, when Plaintiff still had not received the refund, its representative contacted Ms. Dotton to request proof of the steps she had taken to refund Plaintiff's money. Without providing proof that a refund was in process, Ms. Dotton responded:

> As I have stated before we have made the request. I was transparent when I told you that it was going to take some time. Your order was in the production process. Unfortunately you didn't approve of the dates and timeframes. We are working with the organization to refund your money. We are committed to providing this to you.

(Doc. 88-21 at 2.)

On April 29, May 1, May 8, and May 15, 2020, Ms. Dotton directed Mr. Cannon to make additional payments to General Corporate Services, Inc., VWA Advisors, Montrose Capital, and Woods Oviatt Gilman. Plaintiff alleges that Mr. Cannon made the following disbursements from SBM's bank account pursuant to Ms. Dotton's directions: $100,000 of Plaintiff's money to VWA Advisors on May 1, 2020; $1,695 to "General Corp Svces" on May 4, 2020; $200,000 to VWA Advisors and $600,000 to Montrose Capital and Mr. Gauthier on May 11, 2020; and $200,000 to VWA Advisors, $1,600,000 to Montrose Capital, and $10,000 to Woods Oviatt Gilman on May 19, 2020. (Doc. 87 at 12, ¶¶ 55-58, 60.) Plaintiff alleges that none of these transfers were for the purpose of procuring PPE.

On May 26, 2020, when Plaintiff still had not received its refund, Plaintiff's representative wrote to Ms. Dotton: "According to your email of last week, we were to receive the refund by May 23. . . . Can you sen[d] me a copy of the wire transfer with the swift number, I will verify with our bank. We need this to be resolved today." (Doc. 88-22 at 3.) She responded the same day: "I am waiting on the docs from the bank as soon as get them I will send them on to you." *Id.* at 2. She did not, however, send a copy of the wire transfer or any other documentation. On the same day, Ms. Dotton emailed Mr. Cannon and directed him to wire $250,000 to "Montrose Capital" for "settlements" and $100,000 to "VWA Advisors" for "payment per contract" and "MS[.]" (Doc. 88-8.) Mr. Cannon allegedly used Plaintiff's money to wire $250,000 to Montrose Capital and $100,000 to VWA Advisors for unknown purposes on May 28, 2020.

On May 27, 2020, Plaintiff's representative emailed Ms. Dotton, writing: "Hi, we did not receive anything ! Is there an issue?" to which she responded, "No issue. I am waiting on the bank. The account is in Australia, it's the time zone difference." (Doc. 88-22 at 2.) The following day, on May 28, 2020, Plaintiff's representative contacted Ms. Dotton:

> Hi Julie, It was supposed to be May 23, and now you tell me the funds are in Australia! We transfer the funds to your [U.S.] accounts and you said it was transfer[r]ed to China. What Australia has to do with it? Any way a wire do[es]n't take 36 hours to be completed, If it was done yesterday in

> Australia, you should have a copy right now. And the funds should hit our
> bank account today! Send me proof of transfer[.]

*Id.* Ms. Dotton did not respond or send proof of the wire transfer. Ms. Dotton's
representations that she had initiated a wire transfer to Plaintiff and that she was waiting
on documents from a bank in Australia were false and were intended to delay Plaintiff
from taking prompt action, including legal action, to obtain a refund of its payment.

On June 7, 2020, Ms. Dotton emailed Mr. Cannon a draft letter to send to Plaintiff,
and Ms. Dotton and Mr. Cannon exchanged edits to the draft. Ms. Dotton told Mr.
Cannon that he should not write in the letter that Ms. Dotton was waiting for funds from
"SBLC," explaining, "that is why I just said LOC [letter of credit]. Like we asked [for] an
Increase now we are just waiting for closing on the line and we are good to go." (Doc. 87
at 15, ¶ 73) (internal quotation marks omitted).

On June 9, 2020, Ms. Dotton emailed Plaintiff's representative: "Please see
attached letter [from] our financial advisor who is facilitating the extension of our LOC."
(Doc. 88-23 at 2.) Mr. Cannon, the author of the attached letter and Ms. Dotton's
financial advisor, stated that he was SBM's Managing Director and that:

> Ms. Dotton informed me of the need to refund your payment to you due to
> the issues with the manufacturer timeframes and pricing. We started the
> process several weeks ago to advance the KRP a LOC. The transaction
> should be completing this week. The deposit will go into our corporate
> account and the $8.2m will be wired to your account immediately upon
> receipt.

*Id.* at 3. At the time, Plaintiff was not aware that SBM had received Plaintiff's funds from
the Escrow Agent because Ms. Dotton and KRP concealed this information from
Plaintiff. Plaintiff was unaware of the disbursements Mr. Cannon had made using its
money to NEDC and other entities that were not PPE providers. Representations by Ms.
Dotton that KRP was obtaining a line of credit to send the refund to Plaintiff were false
and were intended to delay Plaintiff from taking prompt action to obtain a refund of its
payment.

On June 16, 2020, Plaintiff's representative received an email from Mr. Cannon
stating that a "good faith payment" would be made while SBM and KRP continued to

6

"work with [their] bank and [their] letter of credit advance for the remainder" of
Plaintiff's money. (Doc. 87 at 16, ¶ 78) (alterations in original) (internal quotation marks
omitted). Mr. Cannon added, "It is, as it always has been[,] our commitment to return the
funds to you." *Id.* (internal quotation marks omitted). The following day, Mr. Cannon and
SBM allegedly transferred $350,000 of Plaintiff's money to Montrose Capital and Mr.
Gauthier. *Id.* ¶ 79.

On June 17, 2020, Plaintiff received a payment of $250,000. (Docs. 88-12 at 4,
¶ 17; 88-24 at 2.) The payment came from Montrose Capital, a Michigan limited liability
company whose registered agent is Mr. Gauthier.

On July 10, 2020, Mr. Cannon told Plaintiff that it would be repaid pursuant to a
payment plan as follows: "I have been advised starting the week of July 20th we can pay
500k for two weeks, then we can pay $1,000,000 per week until the rest is paid up."
(Doc. 87 at 16, ¶ 81) (internal quotation marks omitted). On July 22, 2020, the proposed
week for the first payment of $500,000, Plaintiff's representative emailed Mr. Cannon to
ask when Plaintiff should expect to receive the wired money. Mr. Cannon responded the
following day and stated: "We are providing you with all the documentation on the
financial transaction that allows KRP to refund your monies. Due to COVID everything
is being delayed." *Id.* at 17, ¶ 83 (internal quotation marks omitted). Mr. Cannon
informed Plaintiff's representative that a line of credit would be extended by KRP by an
unidentified source on either July 27 or July 28 and that Plaintiff would receive a "letter
of intent" following the extension of the line of credit. *Id.*

Mr. Cannon's representations that KRP was receiving a line of credit to repay
Plaintiff proved inaccurate as Plaintiff did not receive payments according to the
repayment plan. Plaintiff asserts that Mr. Cannon knew that his representations were false
and intentionally made the representations to delay Plaintiff from discovering Ms. Dotton
and Mr. Cannon's "scheme to steal [Plaintiff's] money and use it to pay off other debts
and enrich themselves." *Id.* ¶¶ 82, 84.

On July 31, 2020, Mr. Cannon sent Plaintiff's representative an email discussing a
transaction between a French bank and two entities that would aid Mr. Cannon in

refunding Plaintiff. Mr. Cannon represented that he had been provided an MT 760, a type of SWIFT message, and was waiting for an MT 799 message from the French bank. Mr. Cannon wrote, "[w]e are at the mercy of international compliance." *Id.* ¶ 86 (alteration in original) (internal quotation marks omitted).

Mr. Morin responded to Mr. Cannon's email noting that he knew that Mr. Cannon's statements were false because an MT 799 precedes an MT 760 and "[t]he MT[ ]799 swift message will have no impact on the financial situation of an individual since it is sent before the funds are frozen. So[], what are we waiting for? Should we expect [] payment this week?" *Id.* at 18, ¶ 87 (fourth alteration in original) (internal quotation marks omitted).

On August 14, 2020, Mr. Cannon sent an email to counsel for Plaintiff providing the following update:

> 1. SBLC [Standby Letter of Credit] transaction is moving forward, hopefully funding by end of next week or early the following week[.]
>
> 2. Trade transaction- we have confirmed with the sending bank that funds will wired on Aug. 24th without fail, it is already locked in the system to be sent, Bond transaction- we have initiated 50m today and another 200m will be done by Tuesday.
>
> 3. Once delivered we can pull funds in 72 hours. I will be able to send confirmation of delivery and then we can send funds once they are released.
>
> Julie [Dotton] will get this done , Thank you and we appreciate your patience[.]

(Doc. 87 at 18, ¶ 90) (third alteration in original). On August 16, 2020, Ms. Dotton confirmed in an email that Plaintiff would receive between $500,000 and $1,000,000 that week; however, no payment was made.

On September 24, 2020, Mr. Cannon sent an email claiming that repayment was delayed because "[t]he Bond transaction we were working on had to be listed on Bloomberg and they needed to file a few other things in order to get it deliverable. We are working on that now." *Id.* at 19, ¶ 94 (internal quotation marks omitted). In the same email, Mr. Cannon stated that he would send a letter of intent that day and would be able to provide Plaintiff with a new payment schedule. Mr. Cannon did neither.

On October 1, 2020, Mr. Cannon told Plaintiff that a payment schedule was forthcoming and that he had "secured a One Billion USD BCL for [Ms. Dotton] to start filling some orders and we have BOTH the Sblc and Bond deliveries taking place in the next day or so." *Id.* at 19, ¶ 96 (internal quotation marks omitted).

On October 29, 2020, Plaintiff sent Ms. Dotton and KRP a demand letter requesting repayment of Plaintiff's money in full within a week. *Id.* at 20, ¶ 100. The money was not repaid. On November 6, 2020, Ms. Dotton responded to Plaintiff's counsel with an email stating, "We have a transaction closing next week. My attorney will reach out to you and we can establish the repayment structure for your client. Thank you for your patience." *Id.* at 20, ¶ 101 (internal quotation marks omitted). No attorney contacted Plaintiff's counsel. Ms. Dotton's statements were false and intended to delay Plaintiff from taking legal action, which could have included emergency motions for an order allowing prejudgment attachment of Ms. Dotton's and KRP's accounts and assets.

Plaintiff alleges that in total Mr. Cannon used Plaintiff's funds to disburse approximately $2,750,000 to NEDC, $64,000 to his family members, and $61,000 to himself. It asserts that all of the transfers Mr. Cannon made were intended to benefit himself and Ms. Dotton by paying off Ms. Dotton's debts and "rewarding" Mr. Cannon "for [his] assistance." *Id.* at 14, ¶ 69. Plaintiff contends that Mr. Cannon helped facilitate Ms. Dotton's theft of Plaintiff's funds using SBM's and NEDC's accounts to avoid detection. Mr. Cannon and SBM allegedly held themselves out as Ms. Dotton and KRP's financial advisor and acted as Ms. Dotton and KRP's agents in their interactions with Plaintiff.

Mr. Cannon is allegedly the sole owner of SBM and NEDC and controls these entities' bank accounts. After the Escrow Agent transferred Plaintiff's $8,200,000 payment to SBM's bank account, Plaintiff asserts that Mr. Cannon retained some of the funds in SBM's account and transferred $2,750,000 to NEDC's bank account. Plaintiff contends that neither SBM nor NEDC has an office, online presence, or email domain; that both SBM and NEDC are affiliated with Mr. Cannon's home address; and that Mr. Cannon uses the same personal email address to conduct business for both SBM and

NEDC. It alleges that SBM and NEDC are "undercapitalized companies" whose bank accounts are used by Mr. Cannon as his personal accounts and which do not provide legitimate services to any clients or customers. (Doc. 87 at 22, ¶ 105.)

The Amended Complaint alleges eight causes of action against Defendants: two counts of breach of contract against Ms. Dotton and KRP (Counts I and II); fraudulent inducement against Ms. Dotton and KRP (Count III); unjust enrichment against all Defendants (Count IV); breach of the implied covenant of good faith and fair dealing against Ms. Dotton and KRP (Count V); conversion against NEDC, Montrose Capital, Mr. Cannon, and Mr. Gauthier (Count VI); alter ego liability against Ms. Dotton, Mr. Cannon, and Mr. Gauthier (Count VII); and aiding and abetting fraudulent inducement against SBM, Montrose Capital, Mr. Cannon, and Mr. Gauthier (Count VIII).[2] Plaintiff seeks compensatory damages as well as consequential damages including lost profits, punitive damages, prejudgment interest, and attorney's fees and costs.

## II.   Conclusions of Law and Analysis.

### A.   Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by

---

[2] In the Amended Complaint, Counts IV through VIII are set forth in a non-sequential order.

mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**B.**   **Whether Plaintiff Adequately Pleads a Claim for Aiding and Abetting Fraudulent Inducement Against Mr. Cannon.**

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)) (alteration in original). A "nexus" must exist "between the primary fraud, [the alleged aider and abettor's] knowledge of the fraud[,] and what [the alleged aider and abettor] did with the intention of advancing the fraud's commission[.]" *Id.* (first, second, and third alterations in original) (citation and internal quotation marks omitted).

When asserting a fraud claim, including a claim for aiding and abetting fraud, a complaint must plead "with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b); *Krys*, 749 F.3d at 129 (applying Fed. R. Civ. P 9(b)'s "particularity" rule to claims for aiding and abetting fraud). "[A] complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads 'not . . . constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding circumstances.'" *Krys*, 749 F.3d at 127 (quoting *Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 2010)) (omission in original); *see also* Fed. R. Civ. P 9(b) (providing that, unlike the circumstances constituting alleged fraud, "knowledge[] and other conditions of a person's mind may be alleged generally"). The complaint must allege

"facts showing how a defendant participated as an aider and abettor in the requisite predicate acts." *Charamac Props., Inc. v. Pike*, 1993 WL 427137, at \*4 (S.D.N.Y. Oct. 19, 1993). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner*, 459 F.3d at 295 (internal quotation marks omitted) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)).

Mr. Cannon asserts that Plaintiff fails to state a claim against him for aiding and abetting Ms. Dotton and KRP in fraudulently inducing Plaintiff to sign the Bill of Sale because the court previously dismissed Plaintiff's fraudulent inducement claim against Ms. Dotton and KRP to the extent it involved fraudulent inducement to enter into the Bill of Sale. In dismissing parts of Plaintiff's fraudulent inducement claim against Ms. Dotton and KRP, the court found that "the statements that allegedly induced Plaintiff to enter into the Bill of Sale are wholly related to the Bill of Sale and to Plaintiff's breach of contract claim and therefore cannot provide the basis for a fraudulent inducement claim." (Doc. 33 at 16) (alterations adopted) (internal quotation marks omitted) (quoting *E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC*, 2013 WL 6503526, at \*6 (S.D.N.Y. Dec. 9, 2013)).

The only allegation in Plaintiff's aiding and abetting fraudulent inducement claim against Mr. Cannon that relates to Ms. Dotton and KRP's promises to perform the Bill of Sale is set forth in paragraph 134 of the Amended Complaint: "before the PPE contract was finalized, Mr. Cannon introduced Ms. Dotton to Mr. Bolton so that Mr. Bolton could serve as an Escrow Agent for the fraudulent . . . transaction [with Plaintiff.]" (Doc. 87 at 28, ¶ 134(a).) Although Mr. Bolton later served as the Escrow Agent controlling the Escrow Account, Mr. Cannon's introduction of Ms. Dotton to Mr. Bolton did not constitute or aid and abet a "misrepresentation[] concerning contract terms." *Bloom v. Rock*, 2010 WL 2267468, at \*7 (S.D.N.Y. May 27, 2010) ("[W]hen an alleged representation relates to the terms of a contract, that representation is not collateral or extraneous to the contract and cannot support a fraud claim."). The court therefore DENIES Mr. Cannon's motion to dismiss Plaintiff's aiding and abetting fraudulent

12

inducement claim on the ground that it is duplicative of a breach of contract claim. It is not.

Mr. Cannon further contends that Plaintiff fails to allege that it suffered any damages by delaying legal action due to Ms. Dotton and KRP's fraud and, in turn, he therefore could not have caused any damages either. In its November 1, 2022 Order granting in part and denying in part Plaintiff's motion for default judgment against Ms. Dotton and KRP (Doc. 115), the court found Ms. Dotton and KRP jointly and severally liable for fraudulent inducement, causing Plaintiff to suffer an injury in the amount of $7,950,000 due to Ms. Dotton's and KRP's misrepresentations that they intended to refund Plaintiff's money. Plaintiff has thus plausibly pled the first element of an aiding and abetting fraudulent inducement claim by alleging the commission of an underlying tort. Mr. Cannon does not contend that he lacked actual knowledge of Ms. Dotton's and KRP's fraudulent inducement, nor does he dispute that he provided substantial assistance to aid in the fraud's commission. The Amended Complaint amply pleads both of these elements.

Accepted as true, the Amended Complaint's factual allegations "give rise to an inference of [Mr. Cannon's] knowledge" of Ms. Dotton and KRP's plan to fraudulently induce Plaintiff to delay legal action and prevent Plaintiff from recovering its $8,200,000 payment. *Krys*, 749 F.3d at 129. Mr. Cannon was not merely a passive bystander, but rather "directly involved" in disbursing Plaintiff's money for purposes other than buying PPE and actively concealing those transfers from Plaintiff. *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). For the foregoing reasons, the court DENIES Mr. Cannon's motion to dismiss Plaintiff's aiding and abetting fraudulent inducement claim.

Mr. Cannon argues that if Plaintiff's aiding and abetting claim is allowed, Plaintiff may not claim lost profits as damages. In the Amended Complaint, Plaintiff alleges that it "has lost profits it reasonably expected to make in connection with selling the PPE products purchased from KRP and Ms. Dotton." (Doc. 87 at 29, ¶ 137.) Plaintiff seeks leave to "prove its entitlement to consequential damages if it prevails on its aiding and

13

abetting fraud claim." (Doc. 101 at 14.)

"A court may properly dismiss a claim for consequential damages at the pleading stage where the allegations are insufficient on their face to state a claim[.]" *ERC 16W Ltd. P'ship v. Xanadu Mezz Holdings LLC*, 2015 WL 247404, at *9 (N.Y. Sup. Ct. Jan. 14, 2015), *aff'd*, 18 N.Y.S.3d 853 (N.Y. App. Div. 2015). Here, Plaintiff cannot recover for lost profits for fraudulent inducement because "New York measures damages in fraud cases based on the out-of-pocket loss suffered by plaintiff, but does not include lost profits." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 736 (S.D.N.Y. 1997); *see also Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1374 (N.Y. 1996) ("Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud[.]") (internal citations omitted). Mr. Cannon's motion to dismiss Plaintiff's request for lost profits for its aiding and abetting fraudulent inducement claim is therefore GRANTED.

## C. Whether Plaintiff Adequately Pleads Unjust Enrichment Against Mr. Cannon and NEDC.

Both Mr. Cannon and NEDC move to dismiss Plaintiff's unjust enrichment claim, asserting that Plaintiff fails to allege that any enrichment by Mr. Cannon or NEDC was unjust, that Plaintiff cannot bring claims for both unjust enrichment and conversion, and that Plaintiff's unjust enrichment claim is duplicative of its breach of contract claim against Ms. Dotton and KRP.

To adequately plead unjust enrichment under New York law, a plaintiff "must allege that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered[.]" *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citation omitted). "Typical [unjust enrichment] cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled[.]" *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim[.]" *Id.*

14

Plaintiff alleges that "[u]sing [its] funds, Mr. Cannon disbursed approximately $2.75 million of [Plaintiff's] funds to his entity NEDC and $64,000 of [Plaintiff's] funds to his family members, while retaining $61,000 himself." (Doc. 87 at 14, ¶ 70.) It contends that it never received any of the PPE for which it tendered the $8,200,000 payment to the Escrow Account. Taking these factual allegations as true, Plaintiff plausibly alleges that Mr. Cannon and NEDC were enriched at Plaintiff's expense, without giving Plaintiff anything in return, and that it would be inequitable to allow Mr. Cannon and NEDC to retain Plaintiff's funds or the benefits they received from using those funds to pay other obligations. *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (noting that a "specific and direct benefit [is] necessary to support an unjust enrichment claim"); *Green Tree Servicing LLC v. Christodoulakis*, 136 F. Supp. 3d 415, 431 (E.D.N.Y. 2015) ("Contrary to [Defendant's] contention, she and [her co-defendant] were clearly unjustly enriched in 2008, insofar as they received a benefit, i.e., satisfaction of their 2003 Mortgage, without giving plaintiff, or its predecessor or assignor, anything in return[.]") (internal citations omitted).

Regardless of the merits of Plaintiff's unjust enrichment claim, Mr. Cannon and NEDC argue that the claim must be dismissed because Plaintiff also pleads a claim for conversion and thus Plaintiff has an adequate remedy at law. Rule 8(d)(2) of the Federal Rules of Civil Procedure allows "[a] party [to] set out [two] or more statements of a claim or defense alternatively or hypothetically[.]" Where "the possibility remains that 'the defendant has not . . . committed a recognized tort,' but that 'circumstances create an equitable obligation running from the defendant[s] to the plaintiff[s,]'" a plaintiff may plead unjust enrichment and a tort claim in the alternative. *U.S. Bank Nat'l Ass'n v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 266 (S.D.N.Y. 2017) (quoting *Corsello*, 967 N.E.2d at 1185). Drawing all inferences in Plaintiff's favor, Plaintiff could "ultimately fail to prove its . . . conversion claims while still establishing that Defendant[s] received a benefit . . . that [o]ught to in equity and good conscience be turned over to [Plaintiff]." *Haraden Motorcar Corp. v. Bonarrigo*, 2020 WL 1915125, at *10 (N.D.N.Y. Apr. 20, 2020) (internal quotation marks omitted).

Characterizing Plaintiff's unjust enrichment claim as duplicative of Plaintiff's breach of contract claim against Ms. Dotton and KRP is equally without merit. While it is true that "[n]umerous decisions applying New York law have held that an unjust enrichment claim is barred 'if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract[,]'" *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) (emphasis omitted) (quoting *Vista Food Exch., Inc. v. Champion Foodservice, LLC*, 124 F.Supp.3d 301, 312 (S.D.N.Y. 2015)), Mr. Cannon and NEDC are not only non-contracting parties but their duties or lack thereof are not covered by the Bill of Sale.[3] The Bill of Sale did not authorize Ms. Dotton and KRP to direct Plaintiff's payment to third parties for purposes unrelated to the purchase of PPE.[4] It thus does not govern the subject matter of Plaintiff's unjust enrichment claim against Mr. Cannon and NEDC. *See Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 486 (S.D.N.Y. 2011) (permitting unjust enrichment claim despite existence of valid contract between plaintiff and third party where transaction between third party and defendant was unknown to plaintiff and "extraneous" to contract); *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp.*, 2012 WL 3542196, at *10 (S.D.N.Y. Aug. 15, 2012) (declining to dismiss plaintiff's unjust enrichment claim against a non-party to the relevant contracts where "it [did] not appear that the [contracts] contemplated that a purchaser [such as the non-party] would offer side payments to induce the Preferred Shareholders to sell Portfolio

---

[3] Plaintiff's citation to *Green Tree Servicing LLC v. Christodoulakis*, 136 F. Supp. 3d 415 (E.D.N.Y. 2015) is inapposite. In that case, the court dismissed the plaintiff's unjust enrichment claim after finding that "no contract, written, oral or implied-in-fact, cover[ed] the dispute between plaintiff and [defendants.]" *Id.* at 425. The court did not address whether a valid contract between two parties precludes an action for unjust enrichment against third parties.

[4] Contrary to Mr. Cannon's and NEDC's assertion that the "Bill of Sale did not contain any direction or limitation on the use by KRP/Dotton of the money [P]laintiff paid" (Doc. 96-1 at 7), the Bill of Sale states that the $8,200,000 payment was a "deposit to lock in pricing and product" (Doc. 88-14 at 2.) and thus an obligation existed to treat the money "in a particular manner." *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (N.Y. App. Div. 1990). After Ms. Dotton and KRP breached the contract, they were required to return Plaintiff's payment to Plaintiff in full.

Collateral"). The court therefore DENIES Mr. Cannon's and NEDC's motions to dismiss Plaintiff's unjust enrichment claim.

    **D.    Whether Plaintiff Adequately Pleads Conversion Against Mr. Cannon and NEDC.**

    Both Mr. Cannon and NEDC move to dismiss Plaintiff's conversion claim, arguing that the money at issue in this case was not specifically identifiable or subject to an obligation to be returned or treated in a particular manner. The court disagrees.

    The essential elements of a claim for conversion under New York law are "(1) [the] plaintiff's possessory right or interest in the property and (2) [the] defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Grgurev v. Licul*, 229 F. Supp. 3d 267, 285 (S.D.N.Y. 2017). Money may be the subject of a conversion action, provided that "there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Mfrs. Hanover Tr. Co. v. Chem. Bank,* 559 N.Y.S.2d 704, 712 (N.Y. App. Div. 1990). "Thus, conversion [of money] occurs when funds designated for a particular purpose are used for an unauthorized purpose[.]" *Lemle v. Lemle*, 939 N.Y.S.2d 15, 18 (N.Y. App. Div. 2012).

    New York courts have found that money is "specifically identifiable" "when the funds at issue in an action for the conversion of money constitute a 'specific sum,' one that is 'determinate,' and reflects an 'ascertained' amount," even in circumstances where the money has been commingled with other funds. *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 171 N.Y.S.3d 44, 50 (N.Y. App. Div. 2022) (finding that $96,000 payment plaintiffs deposited into their attorney's account was "specifically identifiable" because the specific amount of money transferred first to attorney and then to defendant was ascertained and undisputed); *see also Grocery Delivery E-Servs. USA, Inc. v. Flynn*, 160 N.Y.S.3d 249, 251 (N.Y. App. Div. 2022) ("The commingling of the fund with [non-party] Mariner's general corporate accounts does not render the conversion claim insufficient, because it was defendant and Mariner who commingled the funds[.]"); *Petrone v. Davidoff Hutcher & Citron, LLP*, 54 N.Y.S.3d 25, 27-28 (N.Y. App. Div.

2017) (finding that the fact that a "specific $100,000 fund . . . designated for the benefit of the children" was "commingled with other money in the escrow account does not preclude a cause of action for conversion").

Plaintiff transferred $8,200,000 to the Escrow Account before the Escrow Agent released the entire sum to SBM's corporate account, which Mr. Cannon allegedly controls. Mr. Cannon then allegedly disbursed the money from SBM's account to other entities and individuals, including $2,750,000 to NEDC's corporate account. Plaintiff's $8,200,000 payment constitutes a "specific sum" identified in the Bill of Sale and is "specifically identifiable" for the purposes of Plaintiff's conversion claim. *Fam. Health Mgmt., LLC.*, 171 N.Y.S.3d at 50; *see also ADP Inv. Commc'n Servs., Inc. v. In House Att'y Servs.* 390 F. Supp. 2d 212, 224-25 (E.D.N.Y. 2005) (finding that by stating the "exact amount of the wire transfer" the plaintiff "properly alleges an identifiable sum of money and therefore [its] conversion claim does not fail as a matter of law"). "The limited transfers [of the payment]—which essentially amount to one transfer from [P]laintiff[] (by the[] [Escrow] [A]gent) to defendant [Mr. Cannon]—did not render the funds at issue no longer specifically identifiable." *Fam. Health Mgmt., LLC.*, 171 N.Y.S.3d at 51.

Any potential commingling of Plaintiff's payment with SBM's general corporate accounts prior to the transfer of $2,750,000 to NEDC "does not render the conversion claim [against NEDC] insufficient, because it was [D]efendant [Mr. Cannon] . . . who commingled the funds" and controlled both SBM's and NEDC's accounts. *Grocery Delivery E-Servs. USA, Inc.*, 160 N.Y.S.3d at 251. "[I]t is generally sufficient for a plaintiff to identify a specific transfer of funds that were misappropriated and trace those funds to a knowing recipient[,]" in this case NEDC, and Plaintiff has done so. *City of Almaty, Kazakhstan v. Ablyazov*, 2021 WL 5200220, at *7 (S.D.N.Y. Mar. 29, 2021).

Assuming *arguendo* that SBM "had lawful possession or control over the money when the funds were disbursed to NEDC" on April 20, 2020 (Doc. 106 at 3), Plaintiff's funds were designated for use in purchasing PPE, and neither Mr. Cannon nor NEDC were authorized to use the funds for a different purpose. *See Lemle*, 939 N.Y.S.2d at 18

("[C]onversion occurs when funds designated for a particular purpose are used for an unauthorized purpose[.]"). By alleging transfers to assorted individuals and entities for purposes other than procuring PPE, the Amended Complaint sufficiently pleads that Mr. Cannon and NEDC used the funds for unauthorized purposes.

As of April 21, 2020, Plaintiff was entitled to a full refund of its payment. By retaining Plaintiff's funds, Mr. Cannon and NEDC exercised "dominion" over them "in derogation of [P]laintiff's rights" as their rightful owner. *Grgurev*, 229 F. Supp. 3d at 285; *see also Moses v. Martin*, 360 F. Supp. 2d 533, 542 (S.D.N.Y. 2004) ("[Defendant's] continued retention of the payments collected from plaintiff's customers without authorization and in defiance of plaintiff's superior right of ownership is sufficient to establish conversion as an action distinct from any breach of contract claim.").

For the foregoing reasons, the court finds that Plaintiff has plausibly alleged the essential elements of a claim for conversion of money by Mr. Cannon and NEDC and DENIES Mr. Cannon's and NEDC's motions to dismiss that claim.

### E. Whether Plaintiff Adequately Pleads Alter Ego Liability Against Mr. Cannon.

Plaintiff seeks to pierce SBM's and NEDC's corporate veils and hold Mr. Cannon personally liable for all claims asserted against those entities. Mr. Cannon contends that the Amended Complaint's allegations are conclusory and contain no factual information supporting a claim of alter ego liability.

"New York courts 'disregard corporate form reluctantly,' . . . and "allow[] individuals to incorporate for the very purpose of avoiding personal liability[.]" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 17 (2d Cir. 1996) (internal quotation marks omitted) (citations omitted) (second alteration in original). In order to state a viable cause of action under the doctrine of piercing the corporate veil, a plaintiff "must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury[.]"

19

*Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203 (N.Y. 2018) (quoting *Conason v. Megan Holding, LLC*, 29 N.E.3d 215, 225 (N.Y. 2015)) (internal quotation marks omitted).

To allege domination or control, a party generally must address "whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use." *Okapi Partners, LLC v. Holtmeier*, 2019 WL 1517553, at *4 (S.D.N.Y. Apr. 8, 2019) (internal quotation marks omitted) (quoting *D'Mel & Assocs. v. Athco, Inc.*, 963 N.Y.S.2d 65, 66 (N.Y. App. Div. 2013)). Other factors include: "use of 'common office space' with the alleged dominating person, 'the amount of business discretion' the corporation displayed independent of the dominating person, and 'the payment or guarantee of debts of the dominated corporation' by the dominator." *Schulz v. United States*, 831 F. App'x 48, 49 (2d Cir. 2020) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

Accepting Plaintiff's factual allegations as true, Mr. Cannon is the sole owner and Managing Director of SBM and the sole owner and President, Vice President, and Secretary of NEDC. Neither SBM nor NEDC has a physical office, online presence, or email domain. Both companies are affiliated with Mr. Cannon's home address, and Mr. Cannon uses the same personal email address to conduct business for both companies. Neither company appears to provide legitimate services to any clients or customers. Both companies are undercapitalized. Mr. Cannon controls the bank accounts of both SBM and NEDC and is the only individual authorized to act on behalf of SBM. After Plaintiff's payment from the Escrow Account was released to SBM's account, Mr. Cannon transferred funds between SBM's and NEDC's accounts, used funds in the accounts for personal political donations, and wired thousands of dollars from both accounts to his family members.

In light of these allegations, Plaintiff adequately pleads that Mr. Cannon "exercised considerable authority over [SBM and NEDC] . . . to the point of completely disregarding the corporate form and acting as though [their] assets were his alone to

manage and distribute[.]" *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997) (internal quotation marks omitted) (quoting *Lally v. Catskill Airways Inc.*, 603 N.Y.S.2d 619, 621 (N.Y. App. Div. 1993)). Plaintiff has therefore plausibly alleged that Mr. Cannon exercised "complete dominion" over SBM and NEDC, both generally and with regard to their interactions with Plaintiff and the alleged tortious use of Plaintiff's money.

Because the court finds that Plaintiff plausibly alleges alter ego liability, Mr. Cannon's motion to dismiss that claim is DENIED.

## CONCLUSION

For the reasons set forth above, the court hereby GRANTS IN PART and DENIES IN PART Defendants Mr. Cannon's and NEDC's motions to dismiss. (Docs. 96, 100). SO ORDERED.

Dated this 13ᵗʰ day of January, 2023.

Christina Reiss, District Judge
United States District Court