UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

BUSREL INC.,                                )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        Case No. 1:20-cv-01767
                                            )
JULIE DOTTON; KRP HOLDINGS, LLC;            )
SBM HOLDINGS, LLC; JONATHAN                 )
CANNON; SEAN GAUTHIER; NEW                  )
ENGLAND DEVELOPMENT CORP.; and              )
MONTROSE CAPITAL, LLC,                      )
                                            )
            Defendants.                     )

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DIRECTING CLERK OF COURT TO ENTER A DEFAULT
AS TO MONTROSE CAPITAL, LLC**
(Doc. 172)

Plaintiff Busrel Inc. ("Plaintiff") brings this action against Julie Dotton ("Ms. Dotton"), KRP Holdings, LLC ("KRP"), SBM Holdings, LLC ("SBM"), Jonathan Cannon ("Mr. Cannon"), Sean Gauthier ("Mr. Gauthier"), New England Development Corp. ("NEDC"), and Montrose Capital, LLC ("Montrose Capital") (collectively, "Defendants"), alleging that Defendants improperly retained $7,950,000 of Plaintiff's payment after Plaintiff and KRP agreed to cancel a contract whereby KRP would supply Plaintiff with personal protective equipment ("PPE").

Plaintiff is represented by Judith A. Archer, Esq., Abigail Fay Schwarz, Esq., and Victoria Vance Corder, Esq. Mr. Cannon and SBM are represented by David Bolton, Esq. Mr. Gauthier is self-represented. Montrose Capital and NEDC are not represented.

I.    **Procedural History.**

Plaintiff filed a Complaint against Ms. Dotton, KRP, and SBM on December 2, 2020. (Doc. 1.) On May 4, 2022, the court entered partial judgment in favor of Plaintiff

against SBM in the amount of $2,750,000. (Doc. 78.) Plaintiff filed an Amended Complaint on June 9, 2022, against Mr. Cannon, Ms. Dotton, Mr. Gauthier, KRP, Montrose Capital, NEDC, and SBM. (Doc. 87.)

Thereafter, the court granted in part and denied in part Plaintiff's motion for default judgment on November 1, 2022, awarding Plaintiff damages against Ms. Dotton and KRP jointly and severally on its breach of contract and fraudulent inducement claims, (Doc. 115), and entered partial final judgment in favor of Plaintiff against these Defendants on December 16, 2022, in the amount of $7,950,000 plus $1,811,293.15 in prejudgment and postjudgment interest. (Doc. 127.)

On November 4, 2022, Mr. Gauthier and Montrose Capital filed an answer to the Amended Complaint and asserted crossclaims against Mr. Cannon, Ms. Dotton, KRP, NEDC, and SBM. (Doc. 118.) NEDC answered the crossclaims, but not the Amended Complaint, on November 17, 2022. (Doc. 122.)

On January 13, 2023, the court granted in part and denied in part Mr. Cannon's and NEDC's motions to dismiss, (Doc. 130), and entered default as to NEDC on July 11, 2023. (Doc. 151.) The court granted in part and denied in part Plaintiff's motion for default judgment against NEDC on August 27, 2024. (Doc. 187.)

Pending before the court is Plaintiff's motion for summary judgment against Defendants Mr. Cannon, Mr. Gauthier, and Montrose Capital on its claims for aiding and abetting fraudulent inducement, conversion, unjust enrichment, and alter ego liability. Plaintiff filed its motion for summary judgment on December 8, 2023, (Doc. 172), and Mr. Cannon opposed the motion on January 17, 2024. (Doc. 177.)[1] Plaintiff replied on January 31, 2024, (Doc. 180), at which time the court took the motion under advisement.

---

[1] Mr. Cannon did not file an affidavit in support of his opposition as required by the Western District of New York Local Rules. *See* Loc. R. Civ. P. 7(a)(3) ("Except for motions brought under [Fed. R. Civ. P. 12(b)(1), 12(b)(6), 12(c), and 12(f)], motions and opposition to motions shall be supported by at least one (1) affidavit, declaration or affirmation[.] Failure to comply with this requirement may constitute grounds for resolving the motion against the non-complying party."). The court excuses this violation but will require compliance for future filings.

## II.    Whether the Court Should Consider the Motion as to Montrose Capital.

The court issued an order on June 24, 2024 advising Montrose Capital that failure to obtain counsel within twenty days may result in an entry of default. (Doc. 185.) On July 8, 2024, Mr. Gauthier represented that he has been unable to obtain new counsel. (Doc. 186.) "A corporation may not appear in federal court *pro se*, and default may enter against a corporate defendant that fails to defend itself in the action by retaining counsel." *Kaplan v. Bank Saderat PLC*, 77 F.4th 110, 116 n.8 (2d Cir. 2023). Because Montrose Capital may not appear without an attorney and it has filed no opposition to summary judgment, the court directs the clerk of court to enter a default against it.

## III.    Whether the Parties' Submissions Comply with Fed. R. Civ. P. 56 and the Local Rules.

Local Rule 56(a)(1) does not preclude multiple facts in a single paragraph. Plaintiff's statement of undisputed material facts is thus compliant with the Local Rules. Mr. Cannon's failure to dispute that statement by citation to admissible evidence is not, however, compliant. Western District of New York Local Rule 56 requires that a party moving for summary judgment must file "a separate, **short**, and **concise** statement, in numbered paragraphs, of the **material facts** as to which the moving party contends there is no genuine issue to be tried[,]" including "citation to admissible evidence or to evidence that can be presented in admissible form at trial[.]" Loc. R. Civ. P. 56(a)(1) (emphasis in original). The opposing party must respond to each numbered paragraph and include:

> if necessary, additional paragraphs containing a **short** and **concise** statement of additional **material facts** as to which it is contended there exists a genuine issue to be tried. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.

Loc. R. Civ. P. 56(a)(2) (emphasis in original).

Similarly, under Fed. R. Civ. P. 56(c)(1), "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion" with either citations to the record, a showing that the movant's cited materials do not establish a genuine dispute, or that the

3

movant cannot support a fact with admissible evidence.

> If a party fails to properly support an assertion of fact or fails to properly
> address another party's assertion of fact as required by Rule 56(c), the court
> may: (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion; (3) grant
> summary judgment if the motion and supporting materials—including the
> facts considered undisputed—show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

The purported disputed facts set forth in Mr. Cannon's opposition do not comply with Fed. R. Civ. P. 56(c)(1) and Local Rule 56(a)(2) because they do not include specific record citations. "Statements denying allegations without a citation to any supporting evidence are . . . insufficient to contest a disputed fact[,]" and similarly, "a response contending to neither admit or deny an allegation does not create a genuine issue of fact." *In re Horowitz*, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016). As a result, the court deems Plaintiff's statement of facts admitted.[2]

## IV.    Undisputed Facts.

Plaintiff is a Canadian company incorporated under the laws of the province of Quebec with its principal place of business in Montreal, Canada. It was an official provider of PPE for the Canadian government during the COVID-19 pandemic.

SBM is a limited liability company that is incorporated under the laws of Wyoming with a mailing address in Miller Place, New York. NEDC is a business incorporated under the laws of Vermont with its "principal office business address" in Miller Place, New York. (Doc. 172-1 at 2, ¶ 6.)

---

[2] *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648 (2d Cir. 2005) (finding that the district court "reasonably deemed appellees' statement of facts to be admitted" because defendant, in non-compliance with a local rule, "offered mostly conclusory denials of appellees' factual assertions and failed to include any record citations"); *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (joining "with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute"); *see also Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000) (concluding that a trial court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact").

Mr. Cannon's last known address is in Miller Place, New York. He is the president and the sole member of SBM and the president, vice-president, secretary, and sole owner of NEDC. SBM and NEDC have no other officers, directors, or employees. He is the sole signatory for SBM's Citibank bank account and NEDC's Citibank and TD Bank accounts. He testified that SBM has never filed federal tax returns because it has never been profitable.

Ms. Dotton maintains a New York address and is the CEO of KRP, a New York limited liability corporation. She was also president of Applied Sciences Group ("ASG"), a Buffalo-based technology company.

Mr. Gauthier's last known address and 2020 home address was in Northville, Michigan. Montrose Capital is a limited liability company incorporated under the laws of Michigan with Mr. Gauthier as its sole member and only individual with decision-making authority regarding depositing and withdrawing funds from its accounts. Montrose Capital has never had an operating agreement, official financial statements, a formal office, nor any employees, officers, or directors other than Mr. Gauthier.

### A.    The Bill of Sale and Escrow Agreement.

In late 2019, mutual connections introduced Mr. Gauthier to Ms. Dotton, who was seeking a consultant to support her "in navigating and paying various vendors and creditors to whom she and her companies owed money." *Id.* at 3, ¶ 10. On January 8, 2020, Ms. Dotton and ASG and Mr. Gauthier and Montrose Capital executed a consulting agreement (the "Consulting Agreement), pursuant to which Mr. Gauthier was to "facilitate the payment of all creditors of [ASG.]" (Doc. 172-68 at 3.) He was paid a $20,000 monthly retainer to "go out and be a paymaster, to navigate through accounts, [and] to consult vendors [and] creditors . . . on a general consulting basis." (Doc. 172-83 at 14.) Thereafter, Ms. Dotton forwarded Mr. Gauthier emails from creditors, and in a February 7, 2020 email to a former ASG employee to whom she owed back wages pursuant to a Department of Labor ("DOL") investigation, she introduced Mr. Gauthier as her "paymaster who will be facilitating payments on all ASG debts." (Doc. 172-69 at 2.)

5

In April 2020, Mr. Gauthier, Ms. Dotton, and KRP were introduced to Plaintiff for the purposes of procuring PPE. Unbeknownst to Plaintiff, Mr. Gauthier had no experience selling or procuring PPE and no experience in logistics or shipping. On April 11, 2020, Ms. Dotton characterized to Plaintiff's representative Nicolas Giguère that she could begin shipment of PPE within seven days after receiving a deposit. In reliance on Ms. Dotton's claims regarding her ability to procure large quantities of PPE from a state-owned Chinese supplier, Plaintiff entered a contract with Ms. Dotton and KRP on April 14, 2020 to purchase two million NIOSH N95 masks and ten million SMS 3, 3-ply masks in exchange for payment of $8,200,000 USD (the "Bill of Sale").

On April 15, 2020, the parties entered into an escrow agreement (the "Escrow Agreement"). Mr. Cannon introduced SBM's counsel, David Bolton,[3] to Ms. Dotton on March 31, 2020 so that Mr. Bolton could serve as the Escrow Agent for the transaction with Plaintiff (the "Escrow Agent"), stating that he was "doing business" with Ms. Dotton and is "doing another transaction with her not related to this deal but part of the funds are going to [him] for the other transaction." (Doc. 172-70 at 2.)

Pursuant to the Bill of Sale and Escrow Agreement, Plaintiff wired $8,200,000 to the Escrow Agent on April 15, 2020. That same day, Ms. Dotton and Mr. Gauthier exchanged text messages about waiting for the funds to be sent, in which she told him that she would "tell [Mr. C]annon to pull the entire amount and then open [her] an account so [she] can pay DO[L,]" and he responded that Mr. Cannon would "take it out [no problem] once it hits the account no worries." (Doc. 172-71 at 3.) She also texted him a screenshot of the wire receipt of Plaintiff's funds sent to the Escrow Agent.

One day later, Mr. Cannon emailed Ms. Dotton multiple documents, including one "for the funds going into [his] Corp account[,]" one for an "SBLC deal[,]" and a disbursement sheet that he instructed her to use "whenever there are funds that need to go

---

[3] Mr. Cannon's and SBM's counsel in this lawsuit, David Bolton, is the Escrow Agent identified in the Escrow Agreement. Attorney Bolton is likely to be called as a witness in this proceeding. *See* New York Rule of Professional Conduct 3.7.

out." (Doc. 172-72 at 2, 4.) He stated that the Escrow Agent "will have to physically go to [the] bank, so you should instruct him soon[.]" *Id.* at 2.

On April 17, 2020, the Escrow Agent released the $8,200,000 payment to SBM's Citibank account pursuant to Ms. Dotton's instructions. SBM was not a party to the Bill of Sale, and neither Ms. Dotton nor the Escrow Agent informed Plaintiff that its payment for PPE was released to SBM or to Mr. Cannon.

Mr. Cannon made disbursements of $8,138,777.13 from SBM's Citibank account from April 17, 2020 to June 17, 2020 and retained $61,222.87. He wired $2,750,000 to NEDC's Citibank account, later transferring $5,750 to his son, $59,000 to his former spouse, and hundreds of thousands of dollars to a TD Ameritrade Brokerage Account and an NEDC account at TD Bank. He used funds from NEDC's TD Bank account for personal use, including writing a check to his spouse for $500,000 marked for "Trade Profits" on September 16, 2020. (Doc. 172-64 at 24.)

Starting on April 23, 2020, Montrose Capital received payments sent from SBM to a JP Morgan Chase bank account totaling $3,400,000. Mr. Gauthier testified in deposition that before he received these payments, Ms. Dotton told him that "there were going to be transfers into [his] account to pay off creditors and vendors." (Doc. 172-83 at 22.) He also denied knowing about "any monies from any other party that were transferred to [Ms.] Dotton[]" "[o]ther than the amounts that [Plaintiff] had transferred to [Ms.] Dotton for her benefit[.]" *Id.* At Ms. Dotton's request, Mr. Gauthier transferred Plaintiff's funds from the Montrose Capital account, including $1,400,000 to Five Star Bank and $278,000 to Complete Business Solutions Group for settlements, $98,000 to Ms. Dotton's mother, and $140,000 to her husband. He also transferred $108,020.02 to his personal accounts.

## B. The Cancellation of the Bill of Sale.

After Plaintiff wired the $8,200,000 payment to the Escrow Agent, Ms. Dotton and Mr. Guère began negotiating the delivery schedule for Plaintiff's first order of PPE and the possibility of an order of masks. When an agreement could not be reached, on April 21, 2020, Ms. Dotton represented to Mr. Guère, "We can refund your money and part ways. . . . I'm working out the refund with them now[,]" and "[w]e are refunding

7

you. We can't meet your timeframe[.]" (Doc. 172-14 at 2-3.) Louis Morin, on behalf of Plaintiff, spoke with Ms. Dotton, and the parties agreed to cancel the Bill of Sale, with Ms. Dotton confirming that "We will get your refund request started[,]" and "You will receive your money back." (Doc. 172-15 at 4-5.)

A day later, on April 22, 2020, Ms. Dotton directed Mr. Cannon to disburse funds in the following manner: $600,000 to "Sean Gauthier" for "consultant per contract"; $50,000 to "VWA Advisors" for "payment per contract"; and $42,924 to "Woods Oviatt" for "Legal[,]" Ms. Dotton and KRP's previous counsel in this action. (Doc. 172-1 at 16, ¶ 58) (internal quotation marks omitted). Mr. Cannon made the wire transfers as directed using Plaintiff's money, as well as an $88.89 transfer to Optimal Health.

On April 23, 2020, Mr. Morin requested from Ms. Dotton proof of the wire transfer to confirm the $8,200,000 refund was in progress. On April 24, 2020, Ms. Dotton responded, "We have made the request to the factory. They are working with us to refund. I was very clear that it would take several days to do this." (Doc. 172-18 at 2.) Ms. Dotton did not send proof of the wire transfer. On April 30, 2020, Mr. Morin reiterated to Ms. Dotton his request for proof of the refund. Ms. Dotton responded:

As I have stated before we have made the request. I was transparent when I told you that it was going to take some time. Your order was in the production process. Unfortunately you didn't approve of the dates and timeframes. We are working with the organization to refund your money. We are committed to providing this to you.

(Doc. 172-19 at 2.)

During this period and thereafter, Mr. Gauthier made numerous fund transfers at Ms. Dotton's request: $18,000 to her mother on April 28, 2020, $30,000 on April 30, 2020, and $30,000 on May 14, 2020; $15,000 to Zwicker Associates and $15,000 to an individual on May 1, 2020; $30,000 to an individual on May 4, 2020; and $80,000 and $20,000 to her husband on May 19, 2020 and June 1, 2020, respectively.

On April 29, 2020, Ms. Dotton requested Mr. Cannon transfer $1,695 to "General Corporate Services, Inc." for "Cook Islands LLC[,]" which he confirmed was sent on May 4, 2020. (Doc. 172-1 at 16, ¶ 65) (internal quotation marks omitted). Mr. Cannon

8

also made the following disbursements from SBM's account at Ms. Dotton's direction: $100,000 of Plaintiff's money to VWA Advisors, LLC on May 1, 2020; $1,695 to "General Corp Svces[]" on May 4, 2020; $200,000 to VWA Advisors and $600,000 to Montrose Capital for "settlements[]" on May 11, 2020; and $200,000 to VWA Advisors, $1,600,000 to Montrose Capital for "settlements[,]" and $10,000 to Woods Oviatt Gilman on May 19, 2020. *Id.* at 18, ¶¶ 73-74, 77 (internal quotation marks omitted).

On May 26, 2020, when Plaintiff still had not received its refund, Mr. Morin wrote to Ms. Dotton: "According to your email of last week, we were to receive the refund by May 23. . . . Can you sen[d] me a copy of the wire transfer with the swift number[?] I will verify with our bank. We need this to be resolved today." (Doc. 172-21 at 2.) She responded: "I am waiting on the docs from the bank[.] [A]s soon as get them I will send them on to you." *Id.* She did not, however, send a copy of the wire transfer or any other documentation. On the same day, Ms. Dotton directed Mr. Cannon to wire $250,000 to Montrose Capital for "settlements[]" and $100,000 to VWA Advisors, transfers he sent on May 28, 2020 from SBM's bank account. (Doc. 172-1 at 19, ¶ 83) (internal quotation marks omitted).

On May 27, 2020, Mr. Morin emailed: "Hi, we did not receive anything ! Is there an issue?" to which she responded, "No issue. I am waiting on the bank. The account is in Australia, it's the time zone difference[.]" (Doc. 172-22 at 2.) The following day, Mr. Morin contacted Ms. Dotton:

> It was supposed to be May 23, and now you tell me the funds are in Australia! We transfer the funds to your [U.S.] accounts and you said it was transfer[r]ed to China. What [does] Australia has to do with it? Any way[,] a wire do[es]n't take 36 hours to be completed[.] If it was done yesterday in Australia, you should have a copy right now. And the funds should hit our bank account today! Send me proof of transfer[.]

*Id.* Ms. Dotton did not respond or send proof of the wire transfer.

On June 7, 2020, Ms. Dotton emailed Mr. Cannon a draft letter to send to Plaintiff, and exchanged edits, including language at one point that Ms. Dotton "is set to receive a deposit in the amount of [the SBLC monetization amount] within the next several days."

(Doc. 172-76 at 4.) Ms. Dotton wrote to Mr. Cannon that she "[did]n't want [Plaintiff] to know too much[.]" *Id.* at 5. On June 9, 2020, Ms. Dotton emailed Mr. Morin: "Please see attached letter [from] our financial advisor who is facilitating the extension of our LOC." (Doc. 172-23 at 2.) The attached letter bore Mr. Cannon's signature and title as SBM's Managing Director, as well as the following message:

> Ms. Dotton informed me of the need to refund your payment to you due to the issues with the manufacturer timeframes and pricing. We started the process several weeks ago to advance the KRP a LOC. The transaction should be completing this week. The deposit will go into our corporate account and the $8.2m will be wired to your account immediately upon receipt.

*Id.* at 3. At the time, Plaintiff was not aware that SBM or Mr. Cannon had received Plaintiff's funds.

On June 16, 2020, Plaintiff received an email from Mr. Cannon stating that a "good faith payment" would be made while "we continue work with our bank and our letter of credit advance for the remainder" of Plaintiff's funds. (Doc. 172-24 at 2.) Mr. Cannon added, "It is, as it always has been[,] our commitment to return the funds to you." *Id.* The following day, Mr. Cannon transferred $350,000 of Plaintiff's funds from SBM's account to Montrose Capital, and Mr. Gauthier sent Ms. Dotton's husband $40,000 and mother $10,000, as well as $10,000 to her mother on June 22, 2020. Mr. Gauthier also transferred $250,000 from Montrose Capital's account to Plaintiff on June 17, 2020 as a partial refund.

### C.    The Repayment Plan.

Ms. Dotton wrote to Mr. Cannon and Mr. Gauthier on July 9, 2020 asking Mr. Cannon to "please tell [her] we have something. Canada's going to do something extreme soon. And if that happens we are all in hot water[,]" she was "afraid these people will ruin us[,]" and that they "need to make a plan for them so we stop anything public[.]" (Doc. 172-77 at 2-3, 5.)

On July 10, 2020, Mr. Cannon told Plaintiff's counsel that it would be repaid pursuant to a payment plan as follows: "I have been advised that starting the week of July

10

20th we can pay 500k for two weeks, then we can pay $1,000,000 per week until the rest is paid up." (Doc. 172-26 at 2.) On July 22, 2020, the proposed week for the first payment of $500,000, Mr. Morin asked Mr. Cannon when Plaintiff should expect to receive the wired money. Mr. Cannon responded the following day: "We are providing you with all the documentation on the financial transaction that allows KRP to refund your monies. Due to COVID everything is being delayed." (Doc. 172-28 at 2.) Mr. Cannon explained that a line of credit would be extended by KRP by an unidentified source the following week and that Plaintiff would thereby receive a "letter of intent[.]" *Id.*

On July 31, 2020, at Ms. Dotton's request, Mr. Cannon sent Mr. Morin an email, drafted by Mr. Gauthier, discussing a transaction between a French bank and two entities that would aid Mr. Cannon in refunding Plaintiff. Mr. Cannon represented that he had been provided an MT 760, a type of SWIFT message, and was waiting for an MT 799 message from the French bank. Mr. Cannon wrote, "[w]e are at the mercy of international compliance." (Doc. 172-29 at 2.)

Mr. Morin responded to Mr. Cannon's email on August 4, 2020, "noting that his statements were false because an MT 799 precedes an MT 760[,]" (Doc. 172-1 at 23, ¶ 104), and stated: "[t]he MT[ ]799 swift message will have no impact on the financial situation of an individual since it is sent before the funds are frozen. So[], what are we waiting for? Should we expect [] payment this week?" (Doc. 172-30 at 2.)

On August 14, 2020, Mr. Cannon sent an email to Plaintiff's counsel, providing the following update:

> 1. SBLC transaction is moving forward, hopefully funding by end of next week or early the following week[.]
>
> 2. Trade transaction- we have confirmed with the sending bank that funds will wired on Aug. 24th without fail, it is already locked in the system to be sent[.]
>
> 3. Bond transaction- we have initiated 50m today and another 200m will be done by Tuesday. Once delivered we can pull funds in 72 hours. I will be able to send confirmation of delivery and then we can send funds once they are released.

11

[Ms. Dotton] will get this done[.] Thank you and we appreciate your
patience[.]

(Doc. 172-31 at 3.) On August 16, 2020, Ms. Dotton confirmed that Plaintiff would
receive between $500,000 and $1,000,000 that week; however, no payment was made.

On September 24, 2020, Mr. Cannon sent an email claiming that repayment was
delayed because "[t]he Bond transaction we were working on had to be listed on
Bloomberg and they needed to file a few other things in order to get it deliverable. We
are working on that now." (Doc. 172-33 at 2.) In the same email, Mr. Cannon stated that
he would send a letter of intent that day and could provide Plaintiff with a new payment
schedule. Mr. Cannon did neither.

Thereafter, Ms. Dotton accused Mr. Gauthier of taking more money than he was
entitled to be paid. She wrote to Mr. Gauthier on September 25, 2020 that "All
participation in communication with any parties on behalf of ASG and KRP need to cease
immediately[.]" (Doc. 172-79 at 4.) On October 8, 2020, Mr. Gauthier requested that
Plaintiff remove him "from any dealings, correspondence or dialogue regarding [Ms.]
Dotton and [Mr.] Cannon[.] I have NO [a]ssociation with them." (Doc. 172-35 at 2.)

On October 1, 2020, Mr. Cannon told Plaintiff that a payment schedule was
forthcoming and that he had "secured a One Billion USD BCL for [Ms. Dotton] to start
filling some orders and we have BOTH the Sblc and Bond deliveries taking place in the
next day or so." (Doc. 172-34 at 2.) Plaintiff did not receive a new payment schedule.

On October 29, 2020, Plaintiff sent Ms. Dotton and KRP a demand letter
requesting repayment of Plaintiff's money in full within a week. On November 6, 2020,
Ms. Dotton responded to Plaintiff's counsel with an email stating, "We have a transaction
closing next week. My attorney will reach out to you and we can establish the repayment
structure for your client. Thank you for your patience." (Doc. 172-37 at 2.) No attorney
contacted Plaintiff's counsel, and Plaintiff has not been repaid the outstanding amount
due of $7,950,000.

In his September 2023 deposition, Mr. Cannon asserted his Fifth Amendment
privilege against self-incrimination and refused to answer questions regarding SBM's and

12

NEDC's employees, capitalization, records, corporate formalities, his ownership and role in the companies, as well as fund transfers, his and Ms. Dotton's communications with Plaintiff's representatives, communications between Defendants, and the SBLC and Bond transactions.

## V.    Conclusions of Law and Analysis.

### A.    Standard of Review.

The court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the non-moving party" and "resolve[s] all ambiguities and draw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (citation and internal quotation marks omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "Once the moving party demonstrates that there are no genuine issues of material fact, the nonmoving party must come forth with evidence sufficient to allow a reasonable jury to find in [its] favor." *Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (alteration in original) (citation and internal quotation marks omitted). "Thus, a nonmoving party can defeat a summary judgment motion only by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of [an] element at trial." *Id.* at 166-67 (alterations in original)

13

(citation and internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (citation omitted). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). However, if the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Id.* at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Kaytor*, 609 F.3d at 545 (emphasis and internal quotation marks omitted).

Although Mr. Gauthier and Montrose Capital did not oppose the motion for summary judgment, "[e]ven when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004); *see also Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) ("[E]ven when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.").

**B.      Whether Plaintiff is Entitled to an Adverse Inference Against Mr. Cannon.**

Plaintiff claims that it is entitled to an adverse inference against Mr. Cannon because of his refusal to engage in discovery and his invocation of the Fifth Amendment. It contends that, as a result, it "remains in the dark about many aspects of the fraud

14

scheme . . . including where all of its money is today." (Doc. 172-84 at 23.) Mr. Cannon argues that his refusal to answer certain questions is irrelevant and not dispositive.

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]" *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). Indeed, a "party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence[.]" *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (citation and internal quotation marks omitted). "While the strength and cogency of the adverse inference should, of course, be tested against the other evidence in the case, 'the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation.'" *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997) (citation omitted). Nonetheless, "[a]n adverse inference against the party invoking the Fifth Amendment by itself is insufficient to establish the absence of a genuine issue of material fact." *Centennial Life Ins. Co. v. Nappi*, 956 F. Supp. 222, 228 (N.D.N.Y. 1997).

Mr. Cannon asserted his Fifth Amendment privilege against self-incrimination in response to document requests, interrogatories, and deposition questions regarding relevant and discernable documents and issues that are central to this case. As a result, his participation in discovery was virtually non-existent. On March 16, 2023, the court granted Plaintiff's motion to compel discovery from Mr. Cannon. (Doc. 143.) Notwithstanding the court's order, Mr. Cannon continued to refuse to engage in discovery. Because of his broad and unambiguous refusal to testify and cooperate in discovery, the court GRANTS Plaintiff's request for an adverse inference against Mr. Cannon.[4]

---

[4] Because the court does not judge credibility at the summary judgment stage, the adverse inference serves only to underscore Mr. Cannon's refusal to provide discovery on the issues he now seeks to contest.

C.    **Whether Plaintiff is Entitled to Summary Judgment on Its Aiding and Abetting Fraudulent Inducement Claim.**

"To establish liability for aiding and abetting fraud under New York law, 'the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Lerner v. Fleet Bank N.A.*, 459 F.3d 273, 292 (2d Cir. 2006)) (alteration in original) (internal quotation marks omitted). "In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004).

A "nexus" must exist "between the primary fraud, [the alleged aider and abettor's] knowledge of the fraud[,] and what [the alleged aider and abettor] did with the intention of advancing the fraud's commission[.]" *Krys*, 749 F.3d at 127 (first, second, and third alterations in original) (citation and internal quotation marks omitted). "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lerner*, 459 F.3d at 295 (internal quotation marks omitted) (quoting *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (N.Y. App. Div. 2003)).

Mr. Cannon claims summary judgment is inappropriate because the court previously dismissed Plaintiff's fraudulent inducement claim against Ms. Dotton and KRP to the extent it involved a fraudulent inducement to enter into the Bill of Sale because it was duplicative of Plaintiff's breach of contract claim asserted against Ms. Dotton. Thereafter, however, the court denied Mr. Cannon's motion to dismiss Plaintiff's aiding and abetting fraudulent inducement claim against him, which was not duplicative.

Based on the law of the case, Plaintiff's aiding and abetting fraudulent inducement claim against Mr. Cannon is properly before the court.[5]

Mr. Cannon next argues that a breach of contract does not demonstrate fraud, there was no underlying fraud violation, and Plaintiff has not identified the damages it suffered by delaying legal action. In a November 1, 2022 Order, the court found Ms. Dotton and KRP jointly and severally liable for fraudulent inducement, causing Plaintiff to suffer an injury in the amount of $7,950,000 due to their misrepresentations regarding a refund. (Doc. 115.)

As to the remaining elements of knowledge and substantial assistance, it is undisputed that Mr. Gauthier became Ms. Dotton's "paymaster[]" and was introduced to Plaintiff to procure PPE without any logistics or shipping experience. (Doc. 172-83 at 14) (internal quotation marks omitted). Similarly, Mr. Cannon does not dispute that he introduced Ms. Dotton to the Escrow Agent, informed the Escrow Agent that he would receive funds from the transaction, represented to Plaintiff that he was Ms. Dotton's financial advisor, and misrepresented to Plaintiff the status of the refund. Mr. Cannon and Mr. Gauthier thus worked in tandem with Ms. Dotton to engage in a fraudulent scheme to deprive Plaintiff of the refund that Ms. Dotton promised would be sent to Plaintiff and to encourage Plaintiff to refrain from taking legal action by making false representations as to why payment of the refund had not been made.

Both Mr. Cannon and Mr. Gauthier initiated numerous undisclosed fund transfers, none of which were to PPE vendors, and, at one point, Mr. Dotton wrote to them that "Canada's going to do something extreme soon[,] . . . if that happens we are all in hot

---

[5] *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) ("[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (alteration adopted) (citation and internal quotation marks omitted); *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'") (citation omitted); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 71 (2d Cir. 2010) (observing that a trial court decision "remains the law of the case[]" unless reversed on appeal).

17

water[,]" and urged her associates Mr. Cannon and Mr. Gauthier to join her in making "a plan for them so we stop anything public[.]" (Doc. 172-77 at 2, 5.) Mr. Cannon and Mr. Gauthier did not proclaim their innocence in the scheme but instead worked with Ms. Dotton and KRP to induce Plaintiff to delay legal action and prevent it from recovering its $8,200,000 payment. The Defendants took Plaintiff's funds for non-PPE purposes, including their own uses, and concealed the fraudulent transfers from Plaintiff.

To the extent Mr. Cannon argues that his actions were limited to the "recommend[ation] [of] an attorney to a business associate[]" and expectation to receive a portion of Plaintiff's funds "could" have been "a finder's fee[,] . . . a commission[,] [o]r [an] expense reimbursement[,]" (Doc. 177 at 4), he fails to support these claims with admissible evidence. *See Anderson*, 477 U.S. at 252 (explaining that at summary judgment, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff"). He provides no legitimate explanation as to why he received hundreds of thousands of dollars of Plaintiff's money without providing a single item of PPE in exchange.

Because of the ample undisputed evidence that Mr. Cannon and Mr. Gauthier actively participated in and furthered Ms. Dotton's and KRP's fraud and because of the adverse inference against Mr. Cannon, Plaintiff has established it is entitled to judgment as a matter of law on its aiding and abetting fraudulent inducement claim against them. *See Visual Arts Found., Inc. v. Egnasko*, 2011 WL 495361 (N.Y. Sup. Ct. Feb. 04, 2011) ("In a civil action, where a suspected aider and abettor elects to exercise his or her Fifth Amendment rights, the court may make an inference of liability[.]").

The court thus GRANTS Plaintiff's motion for summary judgment on its aiding and abetting fraudulent inducement claim against Mr. Cannon and Mr. Gauthier.

### D.    Whether Plaintiff is Entitled to Summary Judgment on Its Conversion Claim.

"Conversion is [1] 'any unauthorized exercise of dominion . . . over property by one who is not the owner of the property [and] [2] which interferes with . . . a superior

18

possessory right.'" *Frink Am., Inc. v. Champion Rd. Mach. Ltd.*, 43 Fed. App'x 456, 458 (2d Cir. 2002) (second, third, and fifth alterations in original) (quoting *Hart v. City of Albany*, 706 N.Y.S.2d 535, 536 (N.Y. App. Div. 2000)). Money may be the subject of a conversion action, provided that "there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (N.Y. App. Div. 1990). "Thus, conversion [of money] occurs when funds designated for a particular purpose are used for an unauthorized purpose[.]" *Lemle v. Lemle*, 939 N.Y.S.2d 15, 18 (N.Y. App. Div. 2012).

New York courts have found that money is "specifically identifiable" "when the funds at issue in an action for the conversion of money constitute a 'specific sum,' one that is 'determinate,' and reflects an 'ascertained' amount," even in circumstances where the money has been commingled with other funds. *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 171 N.Y.S.3d 44, 50 (N.Y. App. Div. 2022) (citation and internal quotation marks omitted) (finding that a $96,000 payment plaintiffs deposited into their attorney's account was "specifically identifiable" because the money transferred first to the attorney and then to defendant was ascertained and undisputed).[6]

Mr. Cannon does not dispute that he made transfers of Plaintiff's PPE payment money but argues that Plaintiff has not demonstrated they were made for a wrongful purpose. Mr. Cannon, however, knew Plaintiff's funds were intended to purchase PPE and neither he nor Mr. Gauthier nor Ms. Dotton were authorized to use them for a different purpose. Instead of procuring PPE or refunding Plaintiff's $8,200,000 payment, Mr. Cannon retained $61,222.87 in the SBM account that he solely controlled, wired $2,750,000 to the NEDC account that he solely controlled, and transferred hundreds of

---

[6] *See also Grocery Delivery E-Servs. USA, Inc. v. Flynn*, 160 N.Y.S.3d 249, 251 (N.Y. App. Div. 2022) ("The commingling of the fund with [non-party] Mariner's general corporate accounts does not render the conversion claim insufficient, because it was defendant and Mariner who commingled the funds[.]"); *Petrone v. Davidoff Hutcher & Citron, LLP*, 54 N.Y.S.3d 25, 27-28 (N.Y. App. Div. 2017) (finding that the fact that a "specific $100,000 fund . . . designated for the benefit of the children" was "commingled with other money in the escrow account does not preclude a cause of action for conversion").

thousands of dollars to his son, former spouse, and a TD Ameritrade Brokerage Account.
These facts are more than sufficient to place him on notice that the transfers were for a
wrongful purpose, as he points to no reason for his receipt of these monies.

Similarly, using the $3,400,000 Montrose Capital received from SBM, Mr.
Gauthier transferred $108,020.02 to his personal accounts and fulfilled Ms. Dotton's
requested wire transfers, including $1,400,000 to Five Star Bank and hundreds of
thousands of dollars to Ms. Dotton's mother and husband. *See BellSouth Telecomm., Inc.
v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (explaining that in opposing
summary judgment "[i]t is not sufficient merely to assert a conclusion without supplying
supporting arguments or facts") (alteration in original) (citation omitted). Again, Mr.
Gauthier, who was aware the funds were intended to purchase PPE, had ample notice
these transfers were wrongful.

In any event, "[t]he tort of conversion does not require defendant's knowledge that
he is acting wrongfully, but merely an intent to exercise dominion or control over
property in a manner inconsistent with the rights of another." *LoPresti v. Terwilliger*, 126
F.3d 34, 42 (2d Cir. 1997) (citation and internal quotation marks omitted). Mr. Cannon's
and Mr. Gauthier's retention of Plaintiff's funds without any right to do so and their
refusal to refund those amounts once they knew their retention was wrongful establishes
the remaining elements of conversion. *See Am. Fin. Servs. Grp. v. Treasure Bay Gaming
& Resorts, Inc.*, 2000 WL 815894, at *12 (S.D.N.Y. June 23, 2000) ("[E]ven if [a third-
party defendant] merely retained a part of the fund without applying it properly, this
action amounted to a constructive conversion.").

Based on the undisputed facts, as well as the adverse inference against Mr.
Cannon, Plaintiff has established its right to judgment in its favor on its conversion claim.
*See Lemle*, 939 N.Y.S.2d at 18 ("[C]onversion occurs when funds designated for a
particular purpose are used for an unauthorized purpose[.]"); *Newbro v. Freed*, 409 F.
Supp. 2d 386, 395 (S.D.N.Y. 2006), *aff'd*, 2007 WL 642941 (2d Cir. Feb. 27, 2007) ("In
New York, an unauthorized wire transfer from one bank account to another constitutes
conversion."); *see S.E.C. v. Pittsford Cap. Income Partners, L.L.C.*, 2007 WL 2455124,

at *15 (W.D.N.Y. Aug. 23, 2007) (drawing an adverse inference from defendants'
assertion of their Fifth Amendment privilege "in response to all substantive questions
regarding all of the [plaintiff's] claims against them[]" at their depositions and granting
plaintiff's motion for summary judgment).

The court therefore GRANTS Plaintiff's motion for summary judgment as to Mr.
Cannon's and Mr. Gauthier's liability for conversion, in the amount of $8,200,000 and
$3,400,000, respectively.

### E.    Whether Plaintiff is Entitled to Summary Judgment on Its Unjust Enrichment Claim.

Plaintiff argues that Mr. Cannon and Mr. Gauthier were unjustly enriched through
the unlawful transfer of its funds and the court should draw a negative inference against
Mr. Cannon's refusal to answer questions regarding this topic. In opposition, Mr. Cannon
asserts that a negative inference is an insufficient basis upon which to grant summary
judgment.

Under New York law, "[t]he basis of a claim for unjust enrichment is that the
defendant has obtained a benefit which in 'equity and good conscience' should be paid to
the plaintiff[.]" *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) (citation
omitted). However, "unjust enrichment is not a catchall cause of action to be used when
others fail. . . . [It] is not available where it simply duplicates, or replaces, a conventional
contract or tort claim[.]" *Id.* Rather, it is "an equitable claim that is unavailable where an
adequate remedy at law exists." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l
N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010).

"When a plaintiff prevails at summary judgment on a conversion claim, the [c]ourt
may dismiss an unjust enrichment claim seeking the same relief." *Steinberg v. Sherman*,
2008 WL 1968297, at *5 (S.D.N.Y. May 2, 2008). As the court has entered summary
judgment for Plaintiff on conversion, there is an adequate remedy at law, and Plaintiff's
unjust enrichment claim is duplicative.

Accordingly, the court DENIES Plaintiff's motion for summary judgment on its
unjust enrichment claim against Mr. Cannon and Mr. Gauthier and DISMISSES this

claim.

F.    **Whether Mr. Cannon and Mr. Gauthier Are Jointly and Severally Liable.**

Plaintiff contends that the court should find Mr. Cannon and Mr. Gauthier jointly and severally liable for aiding and abetting fraudulent inducement and conversion. In opposition, Mr. Cannon argues that there is no evidence that he collaborated with Mr. Gauthier.

Under New York law, "[a] court has discretion to impose joint and several liability when defendants are collaborating or closely related in the commission of a tort." *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 172 (S.D.N.Y. 2010); *see also Hecht v. City of New York*, 454 N.E.2d 527, 530 (N.Y. 1983) ("When multiple tort-feasors are found to be liable for damages, . . . [l]iability is said to be 'joint and several', meaning that each party is individually liable to plaintiff for the whole of the damage[.]"); *Visual Arts Found., Inc. v. Egnasko*, 939 N.Y.S.2d 13, 14 (N.Y. App. Div. 2012) ("Having been found liable on the aiding and abetting claims, [defendant's] co-defendants are jointly and severally liable for the damages resulting from [defendant's] fraud and breaches of fiduciary duty[.]").

"[T]hose who aid and abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme." *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985). "Under New York law, joint and several liability is a question of law that is not related to the factual apportionment of fault among defendants." *Wells Fargo Bank, N.A. v. Nat'l Gasoline, Inc.*, 577 F. App'x 58, 59-60 (2d Cir. 2014) (concluding the district court did not err in finding a defendant "jointly and severally liable for conversion based on concerted action[]" under New York law). Aiding and abetting is a "variet[y] of concerted-action liability[,]" *Pittman by Pittman v. Grayson*, 149 F.3d 111, 122 (2d Cir. 1998), and "[t]he theory of concerted action 'provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in 'a common plan or design to commit a

tortious act[.]'" *Rastelli v. Goodyear Tire & Rubber Co.*, 591 N.E.2d 222, 224 (N.Y. 1992) (citations omitted).

Mr. Cannon and Mr. Gauthier worked with Ms. Dotton to defraud Plaintiff, to distribute Plaintiff's funds, and to fraudulently evade Plaintiff's refund request so that Plaintiff would postpone legal action while they fraudulently transferred Plaintiff's funds beyond its reach. Both committed overt acts in furtherance of the fraudulent scheme. As a result, under New York law, Mr. Cannon and Mr. Gauthier are jointly and severally liable for aiding and abetting fraudulent inducement and conversion.

### G.    Whether Plaintiff is Entitled to Compensatory Damages with Interest.

"Damages for fraud are calculated according to the 'out-of-pocket' rule and must reflect 'the actual pecuniary loss sustained as the direct result of the wrong[.]'" *Norcast S.ar.l. v. Castle Harlan, Inc.*, 48 N.Y.S.3d 95, 97 (N.Y. App. Div. 2017) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)). "Damages may only properly compensate plaintiffs for 'what they lost because of the fraud, not . . . for what they might have gained[.]'" *Id.* (quoting *Lama Holding Co.*, 668 N.E.2d at 1373). On April 15, 2020, Plaintiff paid $8,200,000 to Ms. Dotton and KRP for PPE that it never received. It was promised a full refund on April 21, 2020 but only received a payment of $250,000. Plaintiff is thus entitled to $7,950,000 in compensatory damages for its aiding and abetting fraudulent inducement claim, representing the amount of money that was wrongfully deprived.

For a conversion claim, "the general rule with regard to the measure of damages . . . is to award the value of the property at the time of conversion, together with interest[.]" *Will of Rothko*, 392 N.Y.S.2d 870, 874 (N.Y. App. Div. 1977), *aff'd sub nom. Matter of Rothko's Est.*, 372 N.E.2d 291 (N.Y. 1977); *see Harlem Cap. Ctr., LLC v. Rosen & Gordon, LLC*, 44 N.Y.S.3d 36, 39 (N.Y. App. Div. 2016) ("A claim for conversion accrues when the conversion or taking occurred[.]"). Plaintiff transferred $8,200,000 to Defendants for purchasing PPE on April 15, 2020, which the Escrow Agent released into SBM's account two days later. Mr. Cannon then wired $3,400,000 to Montrose Capital in several transfers, and Plaintiff received a $250,000 payment from

Montrose Capital's account. Mr. Cannon and Mr. Gauthier are thus liable for $8,200,000 and $3,400,000, respectively, in compensatory damages for Plaintiff's conversion claim, and Defendants have the obligation to show they are entitled to offset for the partial refund.

As this is a diversity action, "issues bearing on prejudgment interest are governed by New York law[,]" *Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir. 2000), which entitles Plaintiff to an award of prejudgment interest at the rate of nine percent per annum. *See Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 269 (E.D.N.Y. 2012) ("Under New York law, awarding prejudgment interest on damages awarded for fraud is mandatory.") (citation and internal quotation marks omitted); N.Y. C.P.L.R. § 5004(a) ("Interest shall be at the rate of nine per centum per annum, except where otherwise provided by statute[.]"). This prejudgment interest shall be computed as follows:

> from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b). Plaintiff is entitled to an award of prejudgment interest at the rate of nine percent per annum for both claims commencing on April 21, 2020, the date that the refund was first promised.

Plaintiff is also entitled to postjudgment interest under 28 U.S.C. § 1961(a). *See* 28 U.S.C. § 1961(a) ("Interest shall be allowed on any money judgment in a civil case recovered in a district court."); *see also Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996) ("The award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered."). The award of postjudgment interest shall be calculated in accordance with § 1961(a). *See* 28 U.S.C. § 1961(a) ("Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment.") (footnote omitted).

24

## H.    Whether Plaintiff is Entitled to Punitive Damages.

Plaintiff seeks punitive damages against Mr. Cannon and Mr. Gauthier, which Mr. Cannon claims are inappropriate.[7] "[P]unitive damages are intended 'to punish the tort-feasor for his conduct and to deter him and others like him from similar action in the future.'" *Racich v. Celotex Corp.*, 887 F.2d 393, 396 (2d Cir. 1989) (citing *Sharapata v. Town of Islip*, 437 N.E.2d 1104, 1105 (N.Y. 1982)). "To sustain a claim for punitive damages in tort, one of the following must be shown: intentional or deliberate wrongdoing, aggravating or outrageous circumstances, a fraudulent or evil motive, or a conscious act that willfully and wantonly disregards the rights of another[.]" *Don Buchwald & Assocs., Inc. v. Rich*, 723 N.Y.S.2d 8, 9 (N.Y. App. Div. 2001); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) ("[P]unitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct.'") (citing *Borkowski v. Borkowski*, 355 N.E.2d 287 (N.Y. 1976) (mem)).

Mr. Cannon and Mr. Gauthier aided and abetted a scheme to defraud Plaintiff, an official Canadian PPE supplier, out of millions of dollars during the COVID pandemic. Instead of sourcing PPE, Defendants converted Plaintiff's funds for their personal uses. By taking advantage of a public health crisis for their own benefit, their actions were sufficiently outrageous and egregious to justify a punitive damages award. *See, e.g., Am. Fin. Servs. Grp. v. Treasure Bay Gaming & Resorts, Inc.*, 2000 WL 815894, at *14 (S.D.N.Y. June 23, 2000) (finding punitive damages appropriate when a defendant "consciously and continuously made unauthorized expenditures and detained the funds even though he was well informed of [the third-party defendant's] dire financial circumstances and desperate need for prompt financing").

Plaintiff may submit a proposed judgment and request for a specific amount of

---

[7] Mr. Cannon's citation to *RD Legal Funding Partners, LP v. Worby Groner Edelman & Napoli Bern, LLP*, 150 N.Y.S.3d 317, 321 (N.Y. App. Div. 2021), is inapposite, as there "the demand for punitive damages was properly dismissed because there are no remaining causes of action that alleged conduct that was intentional, malicious, wantonly negligent, or reckless."

punitive damages within thirty (30) days of this Opinion and Order accompanied by a memorandum of law explaining how the requested amount is supported by applicable New York law and consistent with due process. *See Gilead Cmty. Servs., Inc. v. Town of Cromwell*, No. 22-1209, 2024 WL 3747701, at \*9 (2d Cir. Aug. 12, 2024) ("The Supreme Court has established three guideposts for evaluating when the amount of punitive damages becomes so excessive that it crosses the line into arbitrariness, violating due process."); *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013) ("Even if there is no such thing as a *correct* amount of punitive damages, a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate.") (emphasis in original).

## I.    Whether the Court Should Find Alter Ego Liability for Mr. Cannon and Mr. Gauthier.

Plaintiff seeks to pierce SBM's and NEDC's corporate veils and hold Mr. Cannon personally liable for all claims asserted against those entities, as well as to hold Mr. Gauthier liable for all claims asserted against Montrose Capital. Mr. Cannon contends that Plaintiff insufficiently "relies on supposition and conjecture and its request for a negative inference" for this request. (Doc. 177 at 8.)

"New York courts 'disregard corporate form reluctantly,' . . . and "allow[ ] individuals to incorporate for the very purpose of avoiding personal liability[.]" *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 17 (2d Cir. 1996) (second alteration in original) (citations and internal quotation marks omitted). In order to state a viable cause of action under the doctrine of piercing the corporate veil, a plaintiff "must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury[.]" *Cortlandt St. Recovery Corp. v. Bonderman*, 96 N.E.3d 191, 203 (N.Y. 2018) (citation and internal quotation marks omitted).

To allege domination or control, a party generally must address "whether there was a failure to adhere to corporate formalities, inadequate capitalization, commingling

of assets, and use of corporate funds for personal use." *Okapi Partners, LLC v. Holtmeier*, 2019 WL 1517553, at \*4 (S.D.N.Y. Apr. 8, 2019) (internal quotation marks omitted) (quoting *D'Mel & Assocs. v. Athco, Inc.*, 963 N.Y.S.2d 65, 66 (N.Y. App. Div. 2013)). "[F]raud certainly satisfies the wrongdoing requirement[.]" *Baby Phat Holding Co., LLC v. Kellwood Co.*, 997 N.Y.S.2d 67 (N.Y. App. Div. 2014). Other factors include: "use of 'common office space' with the alleged dominating person, 'the amount of business discretion' the corporation displayed independent of the dominating person, and 'the payment or guarantee of debts of the dominated corporation' by the dominator." *Schulz v. United States*, 831 F. App'x 48, 49 (2d Cir. 2020) (citation omitted).

Mr. Cannon is the president and the sole member of SBM and the sole owner and president, vice-president, and secretary of NEDC, neither of which have other officers, directors, or employees. He controls both entities' bank accounts, and SBM has never filed federal tax returns. After Plaintiff's payment to the Escrow Account was released to SBM, Mr. Cannon wired funds to NEDC's account and transferred hundreds of thousands of dollars to his family members and a brokerage account.

Similarly, Mr. Gauthier is the sole member of Montrose Capital and the only individual with decision-making authority to deposit and withdraw funds from its accounts. Montrose Capital has never had a formal office, operating agreement, official financial statements, and employees, officers, or directors other than Mr. Gauthier. It received $3,400,000 from SBM, and Mr. Gauthier used the funds to pay recipients at Ms. Dotton's request, as well as to transfer more than $100,000 to his personal accounts.

Because Mr. Cannon and Mr. Gauthier do not offer contrary evidence, and in light of the adverse inference against Mr. Cannon, no rational trier of fact could fail to find that that each defendant exercised "complete domination" over their respective entities to perpetuate fraud and other wrongs against Plaintiff. There is also evidence that each used corporate funds for personal use and disregarded corporate formalities. The evidence is thus sufficient to find alter ego liability. *See In re Adler, Coleman Clearing Corp.*, 469 F. Supp. 2d 112, 123 (S.D.N.Y. 2007) (finding an individual liable under alter ego liability when he did not provide evidence such as "adoption of bylaws, minutes of meetings of

the board of directors or shareholders, identities of officers, employees or corporate offices, payroll records, or filing of tax returns—documenting that in fact [an entity] existed in corporate form, that it existed for the conduct of legitimate business, and that it adhered to legal and business formalities").

For the reasons stated above, the court GRANTS summary judgment on Plaintiff's request to pierce the corporate veil. Because Mr. Cannon is the alter ego of SBM and NEDC and Mr. Gauthier is the alter ego of Montrose Capital, they are personally liable for the judgment against the entities they dominated and controlled.

## CONCLUSION

Based on the foregoing, the court GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary judgment. (Doc. 172.)

SO ORDERED.

Dated this _30ᵗʰ_ day of August, 2024.

Christina Reiss, District Judge
United States District Court

28